Opinion of the court, by
Judge Hitchcock :
The questions presented to the court for consideration in the present case, if not in themselves peculiarly difficult, are unpleasant to act upon, inasmuch as they involve the construction of some of the earliest legislation of the territorial and state authorities, and render it necessary to decide upon the validity of some of the acts of our courts in the infancy of the government.
To prepare laws which shall meet the exigencies of a people collected not only from every state of the Union, but also from almost every country in the civilized world, is no easy task. People coming together in this manner, and forming a new society, will ontertain different views of policy, according to the prejudices which they *523 may have imbibed in the different countries from whence they emigrated. When, to this circumstance, is added the consideration of the limited nature of that power, which was delegated to the first legislative authority in the territory northwest of the river Ohio, it is not surprising that there should be some apparent inconsistency in their acts.
It is much to be regretted that the only evidence wo have of the construction given to early statutes by the courts at *or about the times these statutes were adopted or passed, is derived from their records and from loose tradition. Unfortunately, as is too often the case in new communities, those records were loosely kept, and the tradition, with respect to their practice, is so contradictory as to be entitled to but little reliance. Contemporaneous construction is of vast importance in deciding questions arising under statutes; but we can not learn that the principal point now in controversy, was ever before submitted to any court in the territory or state for determination.
The title of the lessors of the plaintiff, to the premises in litigation, is perfect and must prevail, unless that title has been destroyed, or has passed from them, in consequence of the proceedings attempted to be proved by the defendants.
The defendants claim title under purchasers, at a sale made by the administrators of Israel Ludlow, in pursuance of an order of the court of common pleas of Hamilton county, acting as a court oí probate or orphans’ court, entered at the August term, 1805. The validity of this title must depend principally, and perhaps entirely, upon the solution of the question, whether the court of common pleas had power or jurisdiction, to make this order. For which purpose it is necessary to examine carefully the pre-existing and various statutes on the subject of the settlement of estates of deceased persons, as well as many other statutes which may bear upon the question, and assist the court in coming to a correct conclusion.
It has been strongly argued, that, from the first existence of a civilized government in the territory which now constitutes the State of Ohio, lands and tenements have been assets in the hands of administrators for the payment of debts. The argument to sustain this position is managed with much ingenuity. The principle, however, is unknown to the common law. By that law administrators have no concern witlf, or control over real estate, and, *524 in those states of the Union, where they possess this power, it is in consequence of statutory regulations. So far as they have over had any control over real estate, so far as it has been, in their hands, assets for the payment of debts, in this state, either under the territorial or state government, it is in consequence of positive enactment. Lot us then ascertain when the principle was first introduced as a part of our system of law.
*It is not found in the ordinance of Congress, “ for the government of the territory of the United States northwest of the river Ohio. ’ This ordinance was passed on July 13,1787, and was ever considered as the fundamental law of the territory. It provides for the appointment of a governor and three judges, to whom legislative power is delegated, until the organization of a general assembly, which is to take place “ so soon as there shall be five thousand free male inhabitants, of full ago, within the district.” The general assembly was organized in 1799, after which, the legislative power of the governor and judges ceased. The power of the governor and judges, while they possessed it, was very much restricted, as appears by the following quotation from the ordinance : “ The governor and judges, or a majority of them, shall' adopt and publish in the district such laws of the original states, criminal and civil, as maybe necessary and best suited to the circumstances of the district, and report them to Congress from time to time, which laws shall bo in force in the district, until the organization of the general assembly therein, unless disapproved of by Congress, but afterward the legislature shall have authority to alter them as they think fit.”
Soon after the passage of this ordinance, the territorial government wont into operation, and so early as 1788 the governor and judges commenced their legislative duties. It will be readily conceived, that from the restrictions under which they labored it must have been extremely difficult to establish a consistent code, suited to the wants and necessities of the people. In consequence of this difficulty, they did, in some few instances, enact and publish original statutes, to complete what they deemed to be aptoper system of laws. These original enactments were considered to be of doubtful authority.
Although the ordinance provides for the manner in which estates of intestates shall descend and be distributed—in which wills shall be made and executed—in whicli lands and tenements shall be con *525 veyed-; yet it. contains no provision on the subject of the settlement of estates of deceased persons. This is left to be provided for by future legislation.
On August 30, 1788, the law “ establishing a court of probate ’’ was published. The power and jurisdiction of the court are defined. Nothing, however, is said, with ^respect to the real estate of a deceased person, nor had that court, by its organizing law, any jurisdiction over this description of property; and in fact, after a careful examination of all the statutes of the territory, we have been unable to find .any one previous to 1795 authorizing an administrator to sell real estate, or making such estate assets in his hands for the payment of debts. Counsel for the defendants, urge the court to infer its existence from certain expressions used in a statute passed or published, August 1, 1792, entitled “an act empowering the judges of probate to appoint guardians to minors and others.” In section 3 of this act, power is given to the guardians of “idiots, lunatics, non compos or distracted persons,” to pay the debts of such persons “ out of their personal estate, or in case that be insufficient, then out of the real estate, in such way and manner as executors .or administrators may or shall by law be authorized to discharge the debts of deceased persons, when the personal estate of such deceased person shall be found insufficient.’’ This is said to be an express recognition of a law, although it is admitted that no such law can be found.
That there may be, and are, cases in which a statute which can neither be found .in the statute book, nor-of record in the proper office, should be presumed or inferred is not controverted. But it can only be done under peculiar circumstances. Where, from great lapse of time, or from extraordinary accidents, there is strong reason to believe that a statute may have been lost; and where, from a uniform and long-continued practice, it may reasonably be supposed that such statute once existed, it may be proper to infer it. In Englaud, where government has existed for centuries, there can be no doubt that many statutes have been lost by time and accident, the principles of which are still adhered to, and have been incorporated with, and constitute a part of the common law. Indeed, some writers go so far as to insist, that the whole system of the common law is built upon such statutes. But what peculiar circumstances are there to justify the court- in making the inference insisted upon by counsel, in the present *526 case? The lapse of time is not so great as to furnish a reasonable presumption, that the statute may have been lost; for it is now but about forty years since the first organization of the government. Uor is there any pretense that, previous *to the year 1795, the practice prevailed of authorizing administrators to sell real estate. So far as the practice prevailed subsequent to that period, it was justified by the law of that year. It must be recollected, that, under both the territorial and state governments, it has been the uniform intention to print every statute of a general nature, and this intention has been carried into execution, unless it be with the exception of the law which the court are called upon to infer. It is strange, indeed, that a law containing such important principles, should be the only one that has never appeared in print. Under these circumstances, to infer a law, as is proposed, would seem to me to savor too much of giving a forced construction to sustain a favorite and preconceived opinion, or to enable us to get over a hard case.
It is said that unless such inference be made, the legislative authortiy which published the law of 1792 must stand chargeable with absurdity. This conclusion by no means follows. Full effect may be given to that act without resorting to presumption or inference. (Guardians are authorized to sell real estate in the same manner that “administrators mayor shall by law be enabled,” etc. Tho words, may or shall, as here used, do not necessarily import that the governor and judges supposed that administrators then had power by law to sell real estate. They more properly refer to future legislation, to provisions which might subsequently bo made on this subject. Had the intention "been to refer to an existing law, the word are would more naturally have been used. I am aware that courts, in construing statutes, never ought to criticise upon words, or grammatical construction of sentences. The intention of the legislature is the great point to be ascertained, and this intention, when once discovered, must be followed, whatever may have been the form of words, or phrases, in which it is expressed. But when you can, by giving to, words or sentences their ordinary import, carry into effect a statute, they ought to receive this interpretation, especially when by extending or varying this import the enacting power will appear to have acted absurdly. Had there been a law in the statute book, authorizing administrators to sell real estate, I should have at once said it was *527 the intention of the governor and judge to refer to that law, together with such others as might subsequently be passed *on the same subject. But I can not, merely from the use of the words before cited, infer the existence of such a law, and then say these words refer to it. It is more reasonable, more consistent with sound construction, to say that reference is had to future legislation.
From an examination of our statutes, it is apparent that both the territorial and state legislatures have been in the habit, when referring to the provisions of an existing law, as the rule, according to which certain things which are, by the referring statute, required to be done, shall be done and performed by making use of the words is or are, most generally, if not universally. Thus in the act of 1805, for the recovery of money secured by mortgage, the mortgaged premises are to be taken in execution, and disposed of, in the same manner, and under the same regulations, that lands or tenements “ are or may be by law disposed of, for the satisfaction of executions.” The same mode of expression is made use of, in a law on the same subject, passed January 2, 1810. So in the act of January 15, 1805 for the appointment of, guardians to “lunatics and others,” an act in part, upon the same subject with the one now under consideration, guardians are, by section 2, authorized, in case of a deficiency of personal property, to pay debts “ out of the real estate, in such manner as executors or administrators, are by law enabled to discharge the debts of deceased persons.”
It is unnecessary, however, to go further in this examination. The existence of the law in contemplation can not be inferred, and the court are clear in the opinion, that previous to 1795 there was no law in the territory, making real property assets, in the hands of administrators, for the payment of debts.
In that year the orphans’ court was created; and on the 16th day of June of the same year, a law was published, adopted from the Pennsylvania code, which took effect on the 1st day of August, entitled “-a law for the settlement of intestates’ estates.” Section 7 of this law enacts, “ if any person or persons shall die intestate, being owners of lands or tenements within this territory at the time of their death, and leave lawful issue to survive them, but not a sufficient personal estate to pay their just debts, and maintain *their children, in such case it shall be lawful for the administrator or *528 administrators of such deceased person to sell and convey such part or parts of the said lands or tenements, for defraying their just debts, maintenance of their children, and for putting them apprentices, and teaching them to read and write, and for the improvement of the residue of the estate, if any there be, to their advantage, as the orphans’ court of the county where such estate lies shall think fit to allow, order, and direct, from time to time.” In the subsequent section of this act, regulations are made with respect to the manner in which real estate is to be sold. It is to be done upon proof made to the orphans’ court that there is a deficiency of personal property, and in pursuance of an order of that court, after due and proper notice given. No other law, containing in any respect similar provisions, was passed until 1808. The act of January, 1802, for the distribution of insolvent estates, directs that the property, “both real and personal,” of the insolvent shall be sold according to law; plainly referring to the law of 1795, which was the only one then in force on the subject.
Whether the law of 1795, which clearly gives authority to administrators, under certain circumstances, to dispose of the real estate of intestates, was repealed before 1808 remains to be hereafter considered.
On the trial of this cause upon the circuit, the defendants offered in evidence the orders of May, 1804, and August, 1805, made by the court of common pleas of Hamilton county, in connection with the testimony of two of the judges of that court, relative to the manner in which the latter order was made. This court overruled the evidence, and whether it was proper so to do, depends upon the solution of the question, whether the court of common pleas had power to make the latter order; in other words, whether that court had jurisdiction of the subject matter.
If the court of common pleas, acting as a court of probate, or orphans’ court, had jurisdiction, an end is put to the question; the evidence ought to have been received. We can not inquire collaterally whether that jurisdiction was properly exercised. The order may have been unadvisedly or erroneously made, but the purchaser has innocently acquired rights of which he can not be divested, so long as it remains unreversed. Under our present existing laws, real *estate can not be sold for the payment of the debts of a deceased person, until it is ascertained that there will be a failure of personal assets. The court of common pleas *529 must be satisfied of such failure, before it can, with propriety, order a sale. Yet when a sale has been made, and its validity is questioned, this court will go no further back than to inquire, whether it was ordered by competent authority. So far as the interests of the purchaser are concerned, we consider such orders equally as available as judgments. The former can be no more impeached collaterally, because there was an abundance of personal estate to have satisfied all debts, than the latter can by showing that the evidence under which they were recovered was insufficient.
We are aware that by adhering to this principle great injustice may many times be done to heirs; for it is too often the case, that those who attempt the settlement of estates are regardless of all other interests than their own. The consequences to be apprehended are not equally dangerous as those which would follow a different course of decision. While lands are sold for the payment of the debts of deceased persons, every inducement should be held forth to encourage purchasers to give the full value of what they buy. And nothing can have a greater tendency to produce this effect than to afford them, when they have purchased, a reasonable protection. There is no good reason why those who purchase from an administrator should not be viewed with the same favorable eye with those who purchase from sheriffs. In either case, it is proper that the order or judgment should remain final and conclusive upon, all parties concerned, until set aside, annulled, or reversed.
An attempt has been made to infer the power of the court of common pleas, to make the order in question, from the extent of their jurisdiction in other matters. That court possesses very general common law and chancery jurisdiction, and many other matters are confided to its care. But, when acting upon those matters, the court must act strictly according to the powers conferred. When acting upon questions relative to roads and highways, for instance, that court is as much restricted by the statute as the county commissioners, when acting on the same subject. When acting as a court of probate or orphans’ court the same rules must *be observed in ascertaining the extent of its powers as if it possessed no other jurisdiction whatever; and while thus acting it is a court of limited jurisdiction. If this principle seem to be departed from, in any measure, in giving the same effect to orders of sale which are given to judgments, we can only say that such *530 course is justified by the policy of the law and the necessity of the case.
Had the court of common pleas power or jurisdiction to make the order of August, 1805? If it possessed this power, it was in virtue of the act of 1795, “for the settlement of intestates’ estates;” for it is clear that this was the only law, previous to 1808, under or by virtue of which an executor or administrator could be authorized, to sell real estate. This brings us to the consideration of the question, whether this was in force at the time the order was made.
On the part,of the plaintiff, it is contended that this law is virtually repealed by the judiciary act of 1803; or rather that it ceased to have any effect, inasmuch as the powers confided by its provisions to the orphans’ court are not expressly transferred or granted to any other court.
Section 1, of article 3, of the constitution of the State of Ohio provides, that “judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, courts of common pleas for each county, in justices of the peace, and in such other courts as the legislature shall from time to time establish.” In the subsequent section of the same article 3, provision is made that the several courts shall have jurisdiction in such cases as may be specified by law. Hence, it is manifest, that although the constitution provides that there shall be a supreme court and courts ■of common pleas, yet it was not the intention of the framers of that instrument to organize those courts or confer upon them any .specific jurisdiction. They are made merelycapable of receiving jurisdiction. Their organization, the extent of their power, the nature of their duties, and the manner in which this power and those ■duties are to be exercised and performed, are all left to be provided for by future legislation. Section 5 of the same article provides, however, that the courts of common pleas in the several counties “should have jurisdiction of all *probate and testamentary matters, granting administration, the appointment of guardians, .and such other cases as shall be prescribed by law.” By a fair construction of this clause, any law which shall confer probate and testamentary jurisdiction on any other court than the court of common pleas would be in contravention of the constitution. •Still the manner of exercising this jurisdiction must be declared by statute.
That no inconvenience might be experienced, in changing from. *531 a territorial to a state government, the schedule to the constitution provides, among other things, that the laws of the territory, then in force and not inconsistent with that instrument, with but one exception, shall continue in force and have full effect until repealed by the legislature.
By the act of April 15, 1803, “ organizing the judicial courts,” the court of probate and orphans’ court are expressly “abolished.” Section 7 of this act relates to the jurisdiction of the courts of common pleas, and enacts that “ they shall have power to examine and take the proofs of wills, to grant administration on intestates’ estates, and to hear and determine all causes, suits, and controversies of a probate and testamentary nature, to appoint guardians for minors, idiots, and lunatics, and to call such guardians to an account.”
Section 26 enacts, “that the supreme court and courts of common pleas, agreeable to their respective jurisdictions, shall take cognizance of all judgments, causes, and matters whatsoever, whether civil or criminal, that are now pending, undetermined, or unsatisfied, either in the general court, courts of common pleas, courts of probate, or general quarter sessions of the peace; and the said supreme court and courts of common pleas, respectively, are hereby authorized and required to hear and decide upon the said matters, as fully and completely as if the said causes had originated in the said supreme court or courts of common pleas.”
From these provisions, taken in connection with the constitution, it is clear that the legislature intended to transfer to the court of common pleas the business of a probate or testamentary nature then pending in the orphans’ court or courts of probate, to be completed in the same manner, and *under the same regulatiors it would have been completed in those conrts had they continued without any change of jurisdiction.
But in the settlement of the estates of persons who should die, what law is to govern? By what rule would the court be regulated in the appointment of administrators, in requiring bonds, and in the discharge of other duties incumbent on them as a court having the sole jurisdiction over probate and testamentary matters? By what rule would administrators be guided in the settlement of estates? Unquestionably by the law of 1795. This was continued by the constitution, and was the only one, or the principal one, in force on the subject. Not a part only, but the *532 whole law remained obligatory. It is true, the courts of common pleas are not expressly authorized to direct administrators to sell real estate; but as the law authorizing such sale was still in force,, and as this was the only court having charge of the settlement of estates, it is proper to give the statute of 1803 such a construction as to confer upon it the same powers as were possessed by the orphans’ court under the law of 1795. Such was the construction given to the law at the time, so far as we can gather anything from contemporaneous practice, and we are not disposed to question the propriety of that construction.
It is further insisted, that the law of 1795 was repealed by the-' act of February 18,1804, “defining the duties of executors and administrators on wills and intestate estates.”
The law in question is not expressly repealed by the last-cited act. If repealed at all it is done by implication. When the provisions of two statutes are so far inconsistent with each other that both can not be enforced, the latter must prevail. But if, by any fair course of reasoning, the two can be reconciled, both shall stand. When the legislature intend to repeal a statute, we may,, as a general rule, expect them to do it in express terms, or by the' use of words which are equivalent to an express repeal. No court will, if it can be consistently avoided, determine that a statute is. repealed by implication. The act of 1804 repeals expressly “all laws and parts of laws contrary to the provisions of this act.” What parts of the law in question are “contrary to the provisions of this act?” This act relates to the personalties *alone of the deceased individual whose estate is to be settled. It provides the-manner in which this description of property shall be disposed of. So far it repeals the law in question. Nothing is said, however, concerning lands and tenements. Full effect may be given to it,, in all its parts, and still those parts of the law of 1795, which relate to real estate, remain in force. There is nothing inconsistent, nothing contradictory. The two statutes may stand together, making a consistent system, constituting real, as well as personal property, assets in the hands of administrators. From these considerations, we are not prepared to say that the law in question was repealed by the act of February 18, 1804.
The next point made by the plaintiff’s counsel is that the law in question was repealed, if not before, at the first session of the third general assembly of the .state, or the session of 1804-5.
*533 First. By “ an act defining the duties of administrators on. wills and intestates’ estates, and providing for the appointment of guardians,” passed February 1, 1805; or, if not, then,
Second. By “an act repealing certain laws,” passed February 22 of the same year. Both these acts, like most of the other laws of the same session, took effect on the first day of June next after their passage.
It must be recollected that at. this session the legislature took upon themselves the task of re-enacting and revising all the laws of a general nature, so as to bring together those in force, and form a system of statutes suitable to the exigencies of the state. It may be well, too, further to bear in mind that the legislation of the state shows that when the legislature have attempted a revision of the laws, one great object has been to collect and embody, in one statute, all those laws and parts of laws on the same subject which had been previously enacted, and which it was intended to continue in force.
The act of 1805, “ defining the duties of administrators,” etc., points but the duties of such persons, authorizes the sale of personal property, unless otherwise directed, by administrators and executors, specifies the manner in which sale shall be made, requires administrators to account, and provides for the distribution of such goods' and chattels as shall remain *after the payment of debts. Every step which shall be taken by an administrator, from the time of his appointment until he shall have discharged his duty, by paying over and delivering to the creditors ■and heirs all the property which shall have come into his hands) or possession in fact, until, so far as he is concerned, the estate is completely settled, is distinctly marked out. And yet not one word is said about real estate. This description of property the administrator is neither authorized to sell nor otherwise interfere with.
Section 11 of this act, after repealing certain laws by their title, repeals “ all laws on the same subject.” The act of 1804, already considered, repeals all laws contrary to its provisions; this, all laws upon the same subject. One of the primary objects which the legislature had in view, in the passage of this'act, was to provide for the “ settlement of intestate estates.” It would seem impossible, then, to resist the conviction that inasmuch as the law of 1805 repeals all laws on the subject of that law, it repeals the law of 1795, which is upon the same subject. The words used, *534 taken in connection with the subject matter, would seem to be equivalent to á repeal of that law by its title. The view, however, which the court have taken of the repealing law of February 22, 1805, supersedes the necessity of a definite decision upon this point.
Section 1 of the last-named statute enacts “ that all laws adopted, or passed by the governor and judges prior to the first day of Sep tember, in the year of our Lord one thousand seven hundred and ninety-nine, and now in force in this state, be and the same are hereby repealed.” The same section contains a proviso, “that-nothing in this act contained shall be construed so as to affect, in any manner, any suit or prosecution now depending and undetermined, but the same shall be carried on to final judgment and execution, agreeable to the provisions of any of the said laws under which the suit or prosecution may have been commenced, and the practice of the courts.”
The policy of the general repealing law has been questioned by the counsel for defendants, and the legislature treated with some considerable degree of severity for its enactment. Whether the law be politic or impolitic, whether its provisions be strictly equitable or otherwise, are considerations *which must not operate with the court in determining its effect. It is our duty to declare, not to make the law. To do this eorrectly, the ordinary rules of construction must be adopted, and the meaning of words, sentences, and phrases must not be distorted in order to sustain a favorite opinion. The great object in the construction of all statutes is to ascertain the intention of the enacting power, and the rules to be observed for this purpose are simple and too well known to need repetition. This intention having been ascertained, the court which refuses to carry it into effect must be regardless of its duty.
A careful examination of the legislative acts of the general assembly, during the session of 1804-5, shows most clearly that it was a leading motive, or intention of that body, to abrogate or repeal all the laws passed or adopted by the governor and judges. Almost every one, and perhaps every one, with the exception of the one in question, is repealed specifically. Yet, as if fearful some one might have escaped their notice, they pass the general repealing law now under consideration. Why this feeling should have prevailed, why they should have been so solicitous, to effect *535 this object, it is not necessary for us to inquire. If the intention is manifest, that is all we should be anxious to know upon the subject.
“All laws adopted or passed by the governor and judges prior to the first day of September, in the year of our Lord one thousand seven hundred-and ninety-nine, and nowin force in this state, be and the same are hereby repealed.” These words are-clear, precise, specific. No man of ordinary capacity could mistake their meaning. There is nothing uncertain, nothing ambiguous, nothing doubtful. There is, in fact, no room left for construction. The law in question was adopted by the governor and judges prior- to September 1, 1799. The intention to repeal it is as clearly manifest as if it had been named by its title. There is no way to escape this conclusion, except by adopting a train of reasoning which would go to convince the great body of the community that there is even more uncertainty in the law than what is now generally apprehended. The counsel for the defendant, however, labor with much ingenuity and seeming con-. fidence to convince the court that although the law in question may have been included by the general *terms of the repealing law, yet that it was not the intention of the legislature to repeal it, but that it should still remain obligatory and in force. The great burden of the argument, however, would seem to be calculated to .produce conviction that the repeal ought not to have taken place, rather than that it did not take place.
In the first place, it is urged that the general practice of the courts in the state, immediately and constantly after this repealing law took effect, shows the understanding to have been that the law in question was still in force. We, without hesitation, recognize the principle that the general practice of courts goes far, and is very conclusive evidence to establish the contemporaneous construction of statutes, and such contemporaneous construction we should be disposed to adhere to, although it might be difficult after a lapse of years, to ascertain why it had been given. But the fact that an order, substantially like the one oi August, 1805, was made in one or two cases, or even in two or three different counties, is not sufficient to establish a general practice. Such general practice is denied, and there is not that evidence that it ever prevailed, which would justify the court in varying, on this account, from that which appears to be a proper construction of the law.
*536 Had there been a judicial construction given to the statute soon after it was enacted, and had that construction been acquiesced in and adhered to, it would have been conclusive upon the subject. We can not find, however, that any such construction was given, and it is believed that this is the first instance in which the question has been presented to any court in the state in such shape as to require a decision. So far as we can ascertain anything about judicial construction heretofore given, it is to be derived from the order in question. And from an exami nation of that order, in connection with the circumstances disclosed in the case, I have no doubt that the court of common pleas acted under the impression that the law of 1795 was repealed. That court did not, at the time, suppose it possessed the power to authorize administrators to sell real estate. It will be found extremely difficult, under any other impression, to account for their proceedings. After the May term, in which it is pretended the order was in fact made, no proceedings had been had, no sale had been effected, in truth no attempt had been made *to sell it. The estate remained as it was before that term. If the law had remained unchanged, an order of sale, to take effect from August, would be equally available and equally advantageous to all concerned, as one to take effect from May. Had there been a sale in virtue of the parol or pretended order of May, had an innocent purchaser acquired rights, this would have been a plausible and perhaps sufficient reason why the entry of August should be directed to be considered as of the May term previous. This is said upon the supposition that the jurisdiction had continued the same. But no single step had been taken to carry that order into execution. Under these circumstances, I can arrive at no other conclusion than that the court acted under the impression that the law in question was' repealed, and that they possessed no further power over the real estate of a deceased person. Entertaining this opinion, but believing that justice required the appropriation of real estate for the payment of debts, and perhaps feeling that there had been on their part some little neglect of duty, the direction was given to have the “ entry considered as of May term,” no doubt at the time being entertained of the propriety of the proceedings.
Let it not be supposed that any corrupt or improper motives are imputed to the members of that court. Nothing could be *537 further from my intention. The testimony of one of them shows what had been done at the previous term, and the motives by which, they were actuated in this proceeding. This testimony, although it is conclusive to remove any unfavorable impression, which might by possibility have been entertained, with respect to the integrity of that court, in this proceeding, was not competent for the purposes for which it was introduced and was properly overruled. That court is a court of record, and its orders, judgments, and decrees must be proved by the record itself.
“ An act for the distribution of insolvent estates,” passed February 1,1805, is cited, to'show that it was not the intention of the legislature, by their general repealing law, to repeal the law in question. This, like the repealing act, took effect on the 1st day of June next after its passage. Upon an examination of its contents, it must appear somewhat doubtful, whether its provisions extend merely to personal estate, or both real and personal. The legislature *seem to have contemplated the distribution of the whole estate among creditors in proportion to their several ■demands. The widow’s right of dower is secured and in strict legal'parlance this interest grows out of, or is attached to real estate. This circumstance strengthens the opinion, that real property is to be distributed. Still the law does not expressly mention real estate. It contains no provision describing the manner in which it should be disposed of; whether it shall be done by the “trustees,” or the “administrators,” whether by order of court or otherwise. Nor is reference made to any other law as a guide in this respect. When we examine the law of January 31, 1802, for the distribution of insolvent estates, which is repealed by the act now under consideration, and compare that law with this, it must be manifest that there is great uncertainty with respect to the intention of the legislature. The act of 1802 authorizes and directs that the judges of probate, whenever the estate of any deceased person shall be insolvent, and after certain enumerated claims are satisfied, “ shall order the residue of the estate, both real and personal, the real being sold according to law, to be paid and distributed to and among the creditors,” according to the terms of, and under the directions contained in this law, “in proportion to the sums unto them respectively due and owing, saving unto the widow, if any there be, her right of dower in the lands and tenements.” The same law provides that the orphans’ court may, upon the prayer *538 of a majority of the creditors, order the sale of such lands and real ’estate as may be set apart to the widow for her dower, subject to her interest therein ; and if such lands should not be disposed of in this manner, then after the death of the widow they are to be sold, and the avails distributed among the creditors, “ in proportion to their several demands, which shall have been proved and allowed,” according to the provisions of the act.
If it was the intention of the legislature, by the law of 1805, now under consideration, to subject the real, as well as personal estate of the insolvent to sale, by the administrator or by the- “ trustees,” for the payment of his debts, it is strange they should not have made an express provision for it. The law which was-then before them, and which they were about to repeal, was, as we have just seen, full and explicit. *Still, in this act, they are cautious about saying anything in direct terms with respect to the real estate, and it is only by implication that we can be induced to suppose they had it in contemplation. After mature deliberation, it would seem to me that a careful comparison of theBtatute now under consideration with the one which it repeals,, instead of having the effect which is contended for by the defendants, would have a tendency to lead the mind to a contrary-conclusion. It would rather furnish additional evidence of an intention on the part of the legislature, in the session of 1804-5, to-withdraw from executors, or administrators, the power of interfering with real estate, and to leave the law, in this respect, as it was previous to the adoption of the statute of 1795.
The court do not authorize me, however, to say that by the law now under consideration it was not the intention to subject the real estate of a deceased insolvent to the payment of his debts, through the instrumentality of his administrators. But if such was the intention, the act was-very imperfect and defective. These imperfections and defects could not be supplied by the court of common pleas acting as a court of probate, nor will they justify this court in refusing to give effect to another statute with respect to the'meaning of which there does not appear to be any doubt.
The counsel for the defendants further contend, that it is manifest from the act of 1805, entitled “ an act for the appointment of guardians to lunatics and others,” that it could not have been intended to repeal the law in question. The second section of this, .statute contains a provision that in failure of personal estate, the *539 guardian of an “ idiot, non compos, lunatic, or insane person,” shall be authorized to discharge the debts' of such person, “ out of thereat estate, in such manner as executors or administrators are bylaw enabled to discharge the debts of deceased persons, when the-personal property is found insufficient.” Here the principle seems to be recognized that, at the time of the passage of this act, there was a law in force authorizing administrators to dispose of real estate, and such appears to have been the fact. The law defining the duties of administrators, etc., already considered, was passed on the first, and the general repealing law on the second day of February, subsequent to the date *of the statute now under consideration. The inferences, however, which are drawn from the above-cited expressions used in this act, can not be acquiesced in by the court.
■When in one statute a reference is made to an existing law, in prescribing the rule or manner in which a particular thing shall be done, or for the purpose of ascertaining powers with which persons named in the referring statute shall be clothed, the effect,, generally, is not to revive or continue in force the statute referred to, for the purposes for which it was originally enacted, but merely for the purpose of carrying into execution the statute in which the reference is made. For this purpose the law referred to is, in. effect, incorporated with and becomes a part of tho one in which the reference is made, and so long as that statute continues, will remain a part of it, and although the one referred to should be repealed, such repeal would no more affect the referring statute than a repeal of this latter would the' one to which reference is made. Such references are common in our legislation, and a slight exam-ination will show that this is the effect intended to be produced. "We will take, for instance, the several laws for the recovery of money secured by mortgage.
In section 6 of “a law subjecting real estate to execution for. debt,” adopted from the Pennsylvania code, on August 15, 1795, provision is made for the recovery of a debt thus secured. After judgment a levari facias is to issue, upon which the mortgaged premises are to be seized and sold. In executing the writ the officer is to be governed by the same rules as in executing similar writs in other cases.
On January 26, Í802, the subject was before the territorial legislature, and an act passed, “providing for the recovery of money *540 •secured by mortgage.” This act, like section 6 of the law “ subjecting real estate to execution for debt,” directs that commencement of proceedings on a mortgage may be by scire facias; and, after judgment is recovered, execution is to be issued and levied •on the mortgaged premise. In the sale of these lands the officer is to be governed by the same rules in giving notice, as “ is or may be required by law for the sale of other real estate taken in execution.”
*Here let it be remembered, that although the same legislature, on the 19th of January, the day before this mortgage- law was ■passed, passed “ an act regulating executions,” by which the before- ■ cited law, “subjecting real estate to execution,” was repealed, in neither of these laws was there any provision for the appraisement oflands. They were to be sold for what they wouldbring. Butthe .act of February 16, 1805, “ regulating judgments and executions,” makes an entire and important change in this respect. Under this law, lands, although subject to execution, must be appraised, and ■can not be sold for less than two-thirds of their appraised value. Thus, the first law on the subject passed by the state authority, contains this new principle, a principle which has been found by •experience, from that day to this, to be highly beneficial, and which, I trust, will not now be expunged from our statute book, whatever other changes may take place. But to return to the mortgage laws.
On February 12, 1805, the state legislature passed an act bearing a similar title with the one last referred to on this subject, repealing that statute as this was itself repealed by another act on ■the same subject, on January 2, 1810, which act still continues in force. Both these last acts, in directing the mode of proceeding .after the recovery of judgment, have this provision, “on which a writ of levari facias may issue, by virtue whereof the mortgaged premises shall be taken in execution and disposed of in the same manner and under the same regulations that land and tenements are, or may be by law disposed of for the satisfaction of judgments.” The repealing part of the law of 1805 has no saving •clause as to mortgages executed prior to the time of its taking •effect, but the money secured by them is to be recovered in the same manner with that secured by mortgages executed subsequent •to that time. To remedy this defect, the legislature, on January 30, 1807, passed a supplemental act providing “ that all money *541 secured by mortgage prior to the taking effect of the law now in force, entitled an act for the recovery of money secured by mortgage, be, and the same is hereby made recoverable, in the same-manner that money secured by mortgages was made recoverable by the laws in force at the time such mortgage *was executed, any law, usage, or custom to the contrary notwithstanding.” A similar provision is contained in the general mortgage law of 1810.
It has been already shown that money thus secured previous to-1805 was to be recovered, partially at least, according to the execution laws of 1705 and 1802, having reference to the time when the mortgage was executed. Those execution laws were repealed-in 1805, by the judgment and execution law of that year. Now, by the passage of this supplemental act, those laws are revived;-, but to a short extent. Not as the general law of the land — not as a rule to govern in &11 cases where money shall be made upon, execution ; but for the purpose, merely, of enabling the mortgagor - to recover his money, according to the law in force at the time he-took his security. Adopt the principle contended for by the defendants and it would follow that those laws are still in force, and. that lands may still be sold on execution, without appraisement, contrary to the settled policy of the state for more than twenty-five years. In like manner the law in question may have been continued in force by the act of January 15,1805, so far as to enable the guardian of an “idiot, non compos, lunatic, or insane person,” to sell real estate for the payment of debts of such persons, but not a law for the “ settlement of intestate estates,” or, in other words, the law in question was incorporated with, and became a part of this latter act.
It is not denied that a law may be revived or continued in force merely by being referred to in another statute, so as to require that the same effect should be given to it as was intended by its-original enactment. But this indirect mode of legislation is not often resorted to, nor ought legislative acts to receive such a construction as will give them this effect, unless such appears clearly to have been the intention of the legislature. In the present case a contrary intention seems to have governed that body; and it is-impossible for the court to come to any other conclusion than that the law in question was repealed from and after June 1, 1805.
Another point made by the counsel for the defendants is, that, admitting the law in question to have been repealed, the order of *542 August term must be effectual, inasmuch as the entry is directed to be “ considered as of May term, 1805.”
*The power of courts to adopt the practice of entering orders, judgments, and decrees, nunc pro tunc, is recognized. But had there been any, the least doubt on the subject, the numerous ■authorities cited by counsel would have removed it. It is many times necessary for the attainment of justice, and, when properly exercised, should be favored. Although the power of a court to •adopt this practice is admitted, there is more difficulty in determining the effect which shall- be given to such order, judgment, or ■decree. There can be no doubt that such an entry may operate •so as to save proceedings which have been had before it is made. For instance, a judgment is actually made at one term, but through mistake or negligence is not entered of record. Subsequent to the ■term, the plaintiff, under the impression that the business had all been correctly transacted, prays out execution. The property of the judgment debtor is levied upon and sold to a bona fide purchaser, who parts with his money in good faith. In such case, the •court may with propriety enter a judgment to be considered of the term, in which it was actually rendered, and should have been ■entered. Such proceedings should be for the furtherance of justice. It would do no injury to the parties concerned, and would secure the rights of an innocent purchaser. So in the present case, had there been a sale in pursuance of the pretended order of May term, and had the jurisdiction remained the same, the court might, with propriety, have made the nunc pro tunc order of August. But there had been no sale nor attempt to sell. Under such circumstances, how is such an order or judgment to be considered with respect to subsequent proceedings ? Shall it operate as an order or judgment of the term, when actually entered, or of a preceding term ? Take the case of the term before supposed. It is actually entered at the August term, although to be considered as •of May, and no execution issues until alter August. Is this to have the same effiect, to all intents, as a judgment of May term? If so, it opei’ates as a lien upon the lands of the debtor from the first day -of that term, and an innocent purchaser who had bought between May and August, after having made an examination to ascertain jwhether there was or was not any lien upon the lands, would be defeated of his purchase. Will it be said that such purchase would to *all intents operate as a judgment of May. Judg *543 ments operate as liens upon the lands of the debtor, from the first ■day of the term in which entered, and no person buying subsequent to that period would be protected, under the plea that he was an innocent purchaser without notice.
Again : If such a judgment was to have the same effect to all intents, as if actually entered in May, the party against whom it was rendered would be deprived of his right of appeal. This right is secured by statute, the party appellant giving bonds, within thirty days after the term, in double the amount of the judgment. The bond could not be given before August, for there would be no judgment of record, no means of ascertaining the amount. And if given after August, it would be too late, more than thirty days after the May term, of which the judgment is to be considered, having expired. This consideration induced the court, in the ■case of Goforth’s adm’rs v. Hezekiah Flint, to decide that, so far as respects the right of appeal, at least, a nunc pro tunc judgment must be considered as a judgment of the term when actually ■entered.
But aside from all these considerations there is, to my mind, an insuperable objection to giving this order the effect wished for by the defendants. This is strictly a question of power. Had the ■court of common pleas power; had they jurisdiction to make the •order in question? Could they in any shape act upon the subject matter? It is not sufficient that they might once have had jurisdiction, that they might have had it in May for instance, but the jurisdiction must still remain when the act is done. Turn whatever way we can, view the question in whatever position it has been or can be presented, still the fact remains, and is proved by the record itself, that the order was actually made in August. The court, it is true, attempt to give it effect by directing that it ■shall “be considered as of May.” But this adds nothing to its validity, unless, when the direction is given, the jurisdiction remains as it was at the time from which the order is directed to be considered. When jurisdiction over any particular subject is withdrawn from a court, the effect is the same, as to that subject, as if the court itself was abolished. It will hardly be contended that a nunc pro tunc entry could have been made by the direction ■of those who *once constituted the court of probate, or orphans’ court, subsequent to the judiciary act of 1803, which ■“abolished” thosecourts, which would be of any validity. Neither *544 can a court, after any particular jurisdiction has been withdrawn, from them, by a similar entry correct any mistake or error which ■may have been committed, while they possessed the jurisdiction,, although the same court continues in existence, and possesses jurisdiction over other subjects. To decide differently, would be to adopt a principle by which a court would be enabled to retain a jurisdiction once possessed, and exercise that jurisdiction contrary to the will of the legislature, merely by making nunc pro tunc entries. Such a principle must be fraught with infinite mischief.
This court have now original and exclusive jurisdiction in cases of divorce and alimony. But should the law conferring this jurisdiction be repealed, it can not be admitted that we could continue, to exercise this jurisdiction by decreeing divorces nunc pro tunc. If it could be done for one year or term, it might for any indefinite length of time. There can be no doubt such decrees would be coram nonjudice and void. Equally void must be the order of the court, of common pleas in the present case, its jurisdiction having ceased when the order was made. Whatever might have been the effect had the jurisdiction remained, under existing circumstances it can be of no avail.
It is said, however, that the order in question was actually an order of May term; and had the court been abolished upon the close of that term, it would have remained obligatory, and might, have been proven by parol. The court of common pleas, whether-acting as a court possessing common law jurisdiction, or asa court-of probate, is a court of record. The proceedings, orders, judgments, decrees of such courts, do not rest in parol. It is by their records-they speak — and there is but one mode, as a general rule, known to the law, by which their acts can be proved, and this is by the record itself. True, there are cases where after the loss or destruction of a record you may prove its contents. In such case all has been done by the court which could be done — a record, which is the legal evidence to prove its acts, has been made. The rights of all parties-concerned are fixed, and those rights ought not to be affected *by time or accident. But before the contents of a record can be proved, it must be shown that it once existed and has been lost by time or accident. This shows that the evidence is not introduced to prove the proceedings of a court as resting in parol, but as they once existed of record. But to introduce parol *545 testimony to prove the proceedings of a court of record, and then substitute this testimony for the record itself, would be a novel proceeding. It would be equally absurd as to sustain an action of debt upon bond, upon proof that the defendant promised to make such an instrument as is set forth in the declaration, although the fact should be admitted that the instrument was never executed.
The difficulty in the present case arises from the circumstances that there is no evidence to show that an order was made in May. The parol testimony is incompetent for the reason just stated, and the order of August is incompetent because made by a court having no jurisdiction over the subject matter upon which it was acting.
Another point made, is, that the order in question is but an extension of the one of May, 1804, and must be considered as a part of the same. This suggestion leads to the necessity of an examination of the order last named. It is in these words : “ The administrators of the estate of Israel Ludlow, deceased, exhibit an account current, and pray the court to issue an order for the sale of real property to defray the debts due from the estate, etc. John Ludlow and James Findlay, sworn in court, the court order so much of the real property sold, as will meet the said demands, except the farm and improved lands near Cincinnati, together with the house and lots in Cincinnati.” In virtue of this order, what real estate could be sold? Let us assimilate it to a grant, and certainly it can not be construed to embrace any other property than would be embraced in a grant containing similar or equivalent words. A. grants to B. all his real estate except a farm and improved lands near a certain place, together with the house and lots in that place. Circumstances might be such ás to raise a doubt with respect to the farm and improved land near the place named, but there would be none as to the lots in the place. These are expressly excepted from the operation of the grant, and whether ^improved or otherwise can make no difference. It is equally clear that the lots in Cincinnati were excepted from sale by the order now under consideration. And so it was considered by the administrators and the court; otherwise the order of August would neither have been applied for, nor made.
This appears to have been a separate and distinct proceeding, carried on for the express purpose of subjecting the town lots and some other property, not embraced in the former order of sale. ' *546 It has no further connection with that order than as relates to tho description of tho property. If this proceeding can be assimilated to a “ suit or prosecution,” it is a new suit or a new prosecution.
Another point made is, that if tho law in question was repealed by the general repealing law of 1805, still it could have no effect upon tho administration of Ludlow’s estate, inasmuch as letters of administration were granted thereon before the latter law took effect. If this position be tenable, it must be, either because by the grant of letters of administration, administrator's acquire rights which can neither be taken away nor varied by legislative enactment; or because creditors, by the death of their debtor, acquire an interest in his estate, which must be satisfied according to the laws in force at the time of his death. It is not believed that either such rights or interests have been acquired.
Whether it bo good policy to change an administration law so as to affect an estate already in tho course of settlement may be questionable, but it is not a question for the court now to determine. We are not, however, prepared to say the legislature have not tho power to do it.
It has been done not unfrequently, and the propriety of the course never questioned, to my knowledge, in any of tho courts of the state. The administrator acts in virtue of powers conferred on him by the statute law, and those powers may be varied as the exigencies of the country require. So long as he governs himself bjr the laws in force he can sustain no injury. At no time has he any interest in the property of tho intestate, except as trustee for those who have claims upon the estate as creditors or distributees. This trust is not conferred upon or reposed in him by the creditors or distributees, but by the law itself.
Creditors do not, by the death of the debtor, acquire any rights to his property which must necessarily be satisfied in *any specific manner. It is proper that their claims should be paid, and with our present ideas of right and justice, we should say that tho real, as well as personal estate of the deceased, ought to be applied for that purpose. In some other countries, however, different opinions prevail, and in our own state, it is manifest there was a time when this description of property could not be appropriated for this purpose through the agency of administrators. Whether *547 there was any other mode by which it could be reached, it is not necessary now to inquire.
The doctrine is sometimes advanced, that the creditor by the death of his debtor acquires a species of lien upon his property. The nature of this pretended lien I could never fully comprehend. It seems to be something that is indescribable. He undoubtedly has a right to the satisfaction of his debt so far as there is property, which gives a claim that ought to be preferred to that of heirs or distributees. But the manner in which the property shall bo disposed of, to give him' this satisfaction, must depend upon the law in force at the time he attempts to obtain it. It has long been the policy of this state that judgments should operate as liens upon the lands of the debtor. This lien does not attach in consequence of any natural or conventional right, or in consequence of any influence of the judgment in itself considered, but in consequence of positive legislative enactment. Upon this principle it has been decided, that the law giving the lien might be varied or repealed subsequently, so as to affect subsisting judgments. With equal propriety may alterations be made in the law relative to the settlement of intestates’ estates, even where the estate is already in a course of settlement.
The view which has been taken of the case renders it unnecessary to determine what is to be undei-stood by the words “ suits and prosecutions,” as usod in the px-oviso of the repealing law, or what effect the repeal shall have upon sales made by the administrator in pursuance of the order of May term, 1804. There can be no doubt but that many difficulties must be overcome in ox’der to arx’ive at a cox’reet conclusion upon either of those points, bat it will be soon enough to solve those difficulties when a case is presented rendering it necessary.
*Upon the whole, the court are of opinion that, previous to the year 1795, there was no law in the territory authorizing administratox’s to sell the lands and tenements of an intestate. .
That" the law of 1795, “for the settlement of intestate estates,” was the first law giving this authority, and the only one previous to Juno, 1808.
That this law was repealed and ceased to have effect from and after the 1st day of June, 1805.
That the order of the court of common picas of' May term, 1804, directing the administrators of Israel Ludlow to sell a part of the *548 real estate of said Ludlow, for the payment of debts, did not embrace the premises in controversy.
That the parol testimony offered to prove an order of sale at the May term, 1805, is incompetent.
That the order of said court of common pleas, at the May term, 1805, was coram nonjudice and void. And,
That the lessors of the plaintiffs could not be divested of their title in consequence of any act done in pursuance of that order.
Of course the testimony offered'by the defendants was properly overruled, and judgment must be entered for the plaintiff.