MAVER OSBORN ET AL.
*vs.*
ZONING BOARD OF APPEALS OF THE
CITY OF STAMFORD

Superior Court        Fairfield County        File No. 62829

MEMORANDUM FILED APRIL 14, 1943.

*Howard Arons,* of Stamford, for the Plaintiffs.

*Joseph J. Rinaldi* and *Charles N. Wexler,* both of Stamford, for the Defendant.

Memorandum of decision on appeal from the action of the Board of Zoning Appeals of the City of Stamford, denying the appeal of the plaintiffs from the refusal of the building inspector to grant a building permit.

CORNELL, J. Plaintiffs are co-partners in the business of instructing students in flying light seaplanes. For this purpose, they have leased a tract of land located on the east branch of Stamford harbor. The planes used by them are equipped with pontoons, and land on and take off from the adjacent harbor waters. When not in use they are stored on the grounds referred to. On April 9, 1941, plaintiffs applied to the building inspector of the City of Stamford for a permit to construct a railway to facilitate the movement of such planes from the land into, and onto it, from, the water. This, it was proposed, would consist of two rails with cross-bars between them laid on the surface of the leased land, extending from the mesne high water line to the channel. On April 10, 1941, the building inspector denied plaintiff's application. Thereupon, plaintiffs appealed to the Board of Adjustments or Appeals (hereinafter referred to as "the board"), under the provisions of paragraph 1 of section XV of the Zoning Regulations of the City of Stamford which authorize the board to "hear and decide appeals where it is alleged there is error in any order, requirement or decision made by the building inspector in the enforcement of [the] regulations." On June 4, 1941, the board advertised, and held, a hearing upon what they mistakenly considered to be plaintiffs' complaint, viz., an application that the body vary some requirement of the regulations under paragraph 11 of section XV of the Zoning Regulations, to permit construction of the mentioned railway, and under that misapprehension denied the same. Plaintiffs, on the erroneous assumption that the board had acted on such appeal, appealed to this court, stating their grievance to be the action of the board in sustaining the building inspector in his refusal to issue the building permit to them. When, during the trial, it developed that the board had not made any decision upon the subject-matter of plaintiffs' appeal

to them but instead had denied them relief for which they had not applied, the court suggested that the proceedings suspend and that the board hear and decide the appeal preferred to them which was still pending before them.

Counsel for the parties then orally stipulated in open court that (a) the Board of Appeals should forthwith call a meeting, preceded by due notice thereof to consider and determine plaintiffs' appeal from the refusal of the building inspector to issue the building permit applied for; (b) that in event that the board should sustain the action of the building inspector the plaintiffs should forthwith appeal from such decision to this court and, the defendant then waiving all formalities and procedural requirements, the matter should be brought to the attention of the same judge who presided over the trial so interrupted, who should hear it as soon as possible thereafter; and, (c) that at such hearing, the evidence already presented which was addressed to the validity of the board's assumed action in sustaining the building inspector, should be received in so far as material and relevant on such appeal. The trial was then suspended and the court ordered the partially heard cause to remain on the docket awaiting further developments. Thereafter, at a meeting held by the Board of Appeals on March 4, 1942, upon notice duly given, the board, after hearing had, denied plaintiffs' appeal from the refusal of the building inspector to issue to them the building permit in question.

Prior to the 1941 session of the General Assembly, the Superior Court, conformably to the provisions of section 429 of the General Statutes, Revision of 1930, had jurisdiction of appeals from zoning boards of appeals, concurrently with "the Court of Common Pleas." *Berigow vs. Davis,* 116 Conn. 553, 556, 165 Atl. 790. The "Court of Common Pleas" therein mentioned meant each of the several courts of Common Pleas of which there was one in each of the counties of Hartford, New Haven, Fairfield, New London and Litchfield, and another in the Judicial District of Waterbury. All of these tribunals possessed purely local jurisdiction, territorially, being limited to the trial of causes in which one of the parties, at least, was a resident of a county or judicial district where such court was established. In an act passed at the 1941 session of the General Assembly (An Act Creating a Court of Common Pleas for the State of Connecticut. Conn. Public Acts, 1941, vol. 1, chap. 286, p. 869), section 429 of the General Statutes, *supra,* was amended as appears in section 50f

of the 1941 Cumulative Supplement to the General Statutes, to provide that after July 1, 1941, all appeals from the doings of zoning boards of appeals should be taken to the court therein created, exclusively. In the face of this provision plaintiffs appealed from the decision of the board made March 4, 1942, to such Court of Common Pleas (hereinafter referred to as the "State Court of Common Pleas") holden in Fairfield County, which cause has been duly returned and now pends there.

This done, counsel for plaintiffs and defendant entered into a stipulation in writing which they filed in this court. The purport of so much of this as is of immediate importance is (1) the parties are mutually desirous of having the issues decided in the Superior Court on their merits, unaffected by any merely procedural considerations; (2) in lieu of commencing a new proceeding by way of appeal to the Superior Court, the plaintiffs, with the consent of the defendant, are to file an amendment to the appeal taken from the action of the board of June 4, 1941 (that is, the instant appeal) and thereby present the same question of the validity of the action of the board of March 4, 1942, as if a formal appeal were taken therefrom to the Superior Court; that the cause then be proceeded with and decided in the same manner as if an appeal had been formally instituted; that if in view of the provisions of section 50f of the 1941 Cumulative Supplement to the General Statutes, it is determined by the Superior Court, or in event that its decision be appealed, then by the Supreme Court of Errors, that the Superior Court has jurisdiction to hear and determine the question, the appeal taken from the action of the Board of Appeals to the Court of Common Pleas shall thereupon be withdrawn; that if it shall be determined by the Superior Court, or in case of appeal from its decision, then by the Supreme Court of Errors, that the Superior Court is without jurisdiction, then the plaintiffs may pursue their appeal in the Court of Common Pleas unprejudiced by the proceedings in the Superior Court; that all of the testimony already presented in the trial thus far in so far as it may be material and relevant shall be considered in determining the question of the validity of the action of the Board of Appeals of March 4, 1942, each of the parties saving their rights under any exceptions taken to its admissibility. The plaintiffs then filed a "second count" containing allegations appropriate to an appeal from the decision of the board

made March 4, 1942, together with various exhibits sufficient, with the evidence stipulated to be consulted, to permit a decision on the questions presented. The remaining subject matter of the stipulation need not be noticed.

The imminent question, of course, is whether the Superior Court, in view of the provisions of section 50f of the 1941 Cumulative Supplement to the General Statutes, the effect of which is to confer exclusive jurisdiction of appeals from zoning boards of appeal on the State Court of Common Pleas, instituted after July 1, 1941, may entertain jurisdiction to determine the validity of the action of the board of March 4, 1942. The proceedings had concerning the matter as detailed, *supra*, must be regarded for all intents and purposes as an appeal therefrom under the provisions of section 429, *supra*. When the power of a court to hear and determine a cause is questioned, or doubt of it exists, that matter must be determined before it decides the merits. *Palmer vs. Reeves*, 120 Conn. 405, 410, 182 Atl. 138; *Marcil vs. Merriman & Sons Co.*, 115 Conn. 678, 682, 163 Atl. 411; *Woodmont Association vs. Milford*, 85 Conn. 517, 524, 84 Atl. 307; *Crandall vs. State*, 10 Conn. 339, 365. In no case can the parties, by their mere stipulation, acquiescense or consent, confer jurisdiction of any cause upon any court. *Marcil vs. Merriman & Sons Co.*, *supra*, p. 682; *McDonald vs. Hugo*, 93 Conn. 360, 364, 106 Atl. 347; *Savings Bank of Danbury vs. Downs*, 74 Conn. 87, 89, 49 Atl. 913. These principles denote that if the amendment mentioned in Cum. Supp. (1941) §50f, taking away the jurisdiction to hear and decide appeals from boards of appeal on zoning conferred upon the Superior Court by section 429, *supra*, is valid, the Superior Court may not determine the matter presented here, notwithstanding the mutual desire of the parties that it do so. The subject matter of section 50f is the condification of the provisions of section 63 of the Act creating the State Court of Common Pleas referred to, *supra*, and the question of its validity is inseparable from that of that legislation. The latter depends upon whether such Act was within the power granted the General Assembly in the State Constitution, to ordain and define the jurisdiction of inferior courts.

Ordinarily. the constitutionality of a legislative act will not be considered unless it is pointedly raised "by someone whose rights will be directly affected...." by it. *Rindge vs. Holbrook*, 111 Conn. 72, 76, 149 Atl. 231, and cases cited in

opinion therein; and, then, only if such party has not become estopped to urge, or has not waived, it. *Coombs vs. Larson,* 112 Conn. 236, 245, 152 Atl. 297; *Chudnov vs. Board of Appeals,* 113 Conn. 49, 57, 154 Atl. 161, and cases cited; *Appeals,* 113 id. 49, 57, 154 Atl. 161, and cases cited; *Lathrop vs. Norwich,* 111 id. 616, 626, 151 Atl. 183. When, however, as here, the court's jurisdiction to hear and determine a cause is dependent upon the constitutionality or lack of it, of a statute, a decision concerning its validity in that respect is unavoidable. Here, it is directly suggested by the subject matter of the stipulation of the parties. In making such an examination, a court is enjoined "to approach the question with great caution, examine it with infinite care and make every presumption and intendment in its favor and to sustain it in the absence of a reasonable doubt of its validity." *State vs. Muolo,* 119 Conn. 323, 325, 326, 176 Atl. 401; *State ex rel. Bush vs. Sixth Taxing District,* 104 id. 192, 205, 132 Atl. 561; *Baker vs. West Hartford,* 89 id. 394, 398, 94 Atl. 383; *State vs. Lay,* 86 id. 141, 145, 84 Atl. 522; *Beach vs. Bradstreet,* 85 id. 344, 349, 82 Atl. 1030. This, to the end that the Act may be upheld so long as it may stand upon any theory not inconsistent with constitutional provisions or the principles which they express or imply. *Antman vs. Conn. Light & Power Co.,* 117 Conn. 230, 237, 167 Atl. 715; *Connelly vs. Deconinck,* 113 id. 237, 240, 155 Atl. 231; *Shelton vs. City of Shelton,* 111 id. 433, 437, 150 Atl. 811; *Conn. Light & Power Co. vs. Southbury,* 95 id. 242, 247, 111 Atl. 363. Equally imperative, however, is the duty to view such a question forthrightly, without compromise with principles that are fully as binding upon the court as they are upon the other departments of government, and unaffected by considerations of expediency or in the spirit of *noblesse oblige.*

The Act in question introduced a novel and theretofore unknown feature into, and made a radical change in, the judicature of Connecticut. Until it became effective, the chief characteristics of this had been, a court of last resort on appeal, a single trial court of statewide jurisdiction and inferior courts consisting of county Courts of Common Pleas in five of the eight counties and a Court of Common Pleas having jurisdiction of territory embracing certain towns in New Haven and Litchfield Counties (the Court of Common Pleas of the District of Waterbury), together with city, town, borough and certain juvenile courts. The latter is a court of limited juris-

diction. All of the others had general jurisdiction limited in their respective original jurisdictions, pecuniarily in civil and in criminal matters to cognizance of minor offenses. By its provisions, the existence of the county Courts of Common Pleas and that established in the District Court of Waterbury was ended and there was created a State Court of Common Pleas with jurisdiction throughout the entire State, which was required to hold terms in all of the eight counties, inclusive of Middlesex, Windham and Tolland, in none of which last named three had there been any court intermediate the local town or city tribunals or justices of the peace and the Superior Court since the County Courts were abolished in 1855. The Act provided for 14 judges who were put on circuit sitting in named places in the several counties and in the District of Waterbury according to allotments made at an annual meeting. In practically all respects the structure and characteristic features of this tribunal were identical with and, in general, the Act made it, in these respects, a replica of the Superior Court. Only in its jurisdiction of causes is there any material difference.

The Act gives the court which it so creates exclusive jurisdiction in all civil actions demanding relief at law in amounts above $100 and not exceeding $2,500; in equity, in which the value of the matter or thing in demand does not exceed $2,500, and in causes claiming both legal and equitable relief, where that separately and distinctly demanded is not in excess of $2,500, although there is ground for questioning whether the jurisdiction given while sitting in the District of Waterbury is other than not in excess of $2,500 concurrent with the Superior Court there. (Compare Cum. Supp. [1941] §808f with idem §811f); also suits for the foreclosure of mortgages wherein the matter in demand does not exceed $2,500; in "....all appeals from the doings of any municipal board, officer or commission, from the doings of the Liquor Control Commission and as, already noted, from boards of appeal on zoning; and while sitting in the territory embraced by the District Court of Waterbury, all appeals from assessments of benefits and damages made by the City of Waterbury or the Borough of Naugatuck. Unlimited jurisdiction concurrently with that of the Superior Court is conferred upon it in actions for the foreclosure of mortgages. In criminal matters, jurisdiction was vested in it while sitting in the counties of New Haven, Fairfield, New London and Litchfield to hear and

determine all causes appealed from any municipal court or justice of the peace and all cases charging non-support in which the accused is bound over to such court; likewise, while sitting in the District Court of Waterbury, with respect to appeals from any town court or justice of the peace in any of the towns within the judicial district. The jurisdiction so described identifies the State Court of Common Pleas as a tribunal of general jurisdiction for the whole State, limited in criminal matters by the nature of offenses of which cognizance is bestowed on it and in civil matters in pecuniary extent, only." *Cinque vs. Boyd*, 99 Conn. 70, 90, 121 Atl. 678.

Unlike the constitutions of a great number of states, that of Connecticut is construed "as a grant, and not as a limitation of power." *Bridgeport Public Library & Reading Room vs. Burroughs Home*, 85 Conn. 309, 319, 82 Atl. 582; *Norwalk Street Railway Co.'s Appeal*, 69 id. 576, 37 Atl. 1080, 38 id. 708. Accordingly, the whole judicial power vests in the judicial department; none resides in the General Assembly. *Bridgeport Public Library & Reading Room vs. Burroughs Home, supra*, p. 319; *Norwalk Street Railway Co.'s Appeal, supra*, 576. Having none, the Legislature can delegate the exercise of none to any court which it may create. The only power which it possesses as respects the judiciary is that conferred upon it in Article Fifth of the State Constitution. That, insofar as the creation of courts is concerned is limited to "inferior" tribunals only. And as respects these it can grant no powers or jurisdiction to them; it may only "define" these. *Styles vs. Tyler*, 64 Conn. 432, 452, 30 Atl. 165. As it is by virtue of the provisions of section 1 of Article Fifth that the General Assembly possessed the authority to ordain the State Court of Common Pleas, if any it had, resort must be had to the content of that Article to discover it.

The text of Article Fifth as it appears in the Revised Statutes of 1875 and all revisions since then differs from the form in which it was submitted to the people for their acceptance or rejection in that the words "supreme court of errors" and "superior court" as they appear therein are capitalized, and so treated as the titles of these tribunals whereas the same terms are not capitalized in that instrument as engrossed, authenticated by the president and clerks of the convention which framed it and as deposited with the Secretary (Journal of the Convention, pp. 71, 72), and as it appears in

all of the revisions of the statutes up to that of 1875. To some extent, at least, it would appear that this departure from the exact context of the instrument, as adopted by the people enters into the controversy apparent in the opinion in *Styles vs. Tyler, supra,* which had not been stilled at the time *Enfield vs. Ellington,* 67 Conn. 459, 34 Atl. 818, was decided. The question assumed to be involved in the first mentioned case was whether the General Assembly possessed power to alter the jurisdiction of the Supreme Court of Errors by requiring it to correct errors of fact as well as of law. The majority opinion, in the discussion, quoted Article Fifth of the Constitution in the form in which it appears in the revision of 1875 and in those since that time, in which the designation of the court of last resort by appeal is written "a Supreme Court of Errors", *Styles vs. Tyler, supra,* p. 442. That opinion, though not entirely predicating on the circumstances mentioned, is based on the assumption that that tribunal is not only created by the Constitution, but, also, that it is therein "established" and named and its jurisdiction defined, and that it is, in effect, therefore, the reincarnation of the "Supreme Court of Errors" ordained by the pre-constitutional General Assembly. On this reasoning, the name "Supreme Court of Errors" as employed in Article Fifth describes a court of precisely the same character and jurisdiction as existed under the identical title when the Constitution was adopted. By the same token the term "a Superior Court" which occurs in the same context and relation in section 1 of Article Fifth signifies the tribunal of the same name in the judicature which preceded that created by the Constitution and by like logic it, too, is established, named and its jurisdiction defined as the same as that possessed by the tribunal of that title in such judicature. A like conclusion has been reached with respect to the Supreme Court of New York which, also, was created by a statute adopted by the colonial legislature and is held to have been incorporated into the judicature when the Constitution of that state was adopted. *Decker vs. Canzoneri,* 9 N.Y.S. (2d) 210, 214, 256 Appel. Div. 68, and cases collected in opinion. *And see, Conger vs. Convery,* 52 N.J.L. 417; *Mott vs. Commissioners,* 126 N.C. 866, 36 S.E. 330.

While the conclusion reached here would be the same on either theory, it is believed that the character and distinctive features of a court are to be determined from its place in the judicature of which it is a component element rather than

from its name alone. This in so far involves a departure from the premise adopted in *Styles vs. Tyler, supra,* that the words "a supreme court of errors" and "a superior court" as they appear in section 1 of Article Fifth are names of courts and the adoption of the premise in its stead that such language is descriptive of the types of tribunal which the General Assembly is required to establish. This, it is believed, bears close fidelity to the text of Article Fifth, which in its adopted form (Journal of the Convention, p. 111) is as follows:

## ARTICLE V.
## OF THE JUDICIARY DEPARTMENT

Section 1. The judicial power of the state shall be vested in a supreme court of errors, a superior court, and such inferior courts as the general assembly shall from time to time, ordain and establish: the powers and jurisdiction of which courts shall be defined by law.

Sec. 2. There shall be appointed, in each county, a sufficient number of justices of the peace, with such jurisdiction in civil and criminal cases as the general assembly may prescribe.

Sec. 3. The judges of the supreme court of errors, of the superior and inferior courts, and all justices of the peace, shall be appointed by the general assembly, in such manner as shall by law be prescribed. The judges of the supreme court, and of the superior court, shall hold their offices during good behavior; but may be removed by impeachment; and the governor shall also remove them, on the address of two-thirds of the members of each house of the general assembly; all other judges and justices of the peace shall be appointed annually. No judge or justice of the peace shall be capable of holding his office after he shall arrive at the age of seventy years.

Under this section of the Constitution, the judicial power of the State is vested in courts of the characters named therein, that is, a Supreme Court of Errors, and a Superior Court, together with such others as the General Assembly is empowered to create from time to time. *Brown vs. O'Connell,* 36 Conn. 432, 446; *Styles vs. Tyler, supra,* pp. 449, 450; *Norwalk Street Railway Co.'s Appeal, supra,* 576, 583; *Bridgeport Public Library & Reading Room vs. Burroughs Home, supra,* 309, 319; *Ansonia vs. Studley, Judge,* 67 Conn. 170, 177, 34 Atl. 1030.

The power of the General Assembly to ordain and establish

courts in addition to those of the characters specifically de-scribed is subject, however, to the limitation that such tribunals be "inferior" to the Superior Court. . *La Croix vs. Commis-sioners,* 49 Conn. 591, 596; *Styles vs. Tyler, supra,* 432, 452, id. (dissenting opinion), p. 468; *Ansonia vs. Studley, Judge, supra,* 170, 177. The term "inferior courts" is one that ap-pears quite generally in state constitutions and in the organic law of territories, but nevertheless, admits of no general or comprehensive definition. This is due to the fact that the provisions contained in such constitutions and in the congres-sional acts creating territories differ from each other to so great an extent in substance and . phraseology, that it is not inconceivable that a court may be inferior to another in one or more respects while co-equal with it in others. In conse-quence courts which have had occasion to deal with the sub-ject have been content to determine only that phase of the matter presented to them, and to abstain from rationalization beyond the needs of the instant problem.

This is true, also, in Connecticut. The term "inferior courts" admittedly includes "the Courts of Common Pleas, the District Court of Waterbury, and the town, borough, city and police courts." *Alcorn, State's Attorney vs. Fellows,* 102 Conn. 22, 30, 127 Atl. 911. But neither in the opinion quoted from nor in any other has any common criterion been furnished by which it may be determine what constitutes an inferior court within the meaning of section 1 of Article Fifth of the State Constitution. Thus it has been said that a county crim-inal Court of Common Pleas is an inferior court, established by the Legislature, *State vs. Campane,* 76 Conn. 549, 57 Atl. 164; that a county Court of Common Pleas "is so far inferior to the Superior Court that a writ of mandamus may be issued by that court to the Court of Common Pleas which it would be the duty of the latter court to obey." *Ansonia vs. Studley, Judge, supra,* 177; that a county Court of Common Pleas is amenable to a writ of prohibition issued against it by the Superior Court, though the jurisdiction to issue it derives from statute. *Fayerweather vs. Munson,* 61 Conn. 431, 439, 23 Atl. 878; *Sherwood, Rec. vs. New England Knitting Co. et al.,* 68 id. 543, 548, 37 Atl. 388; and during the period when appeals were required to be taken from the county Courts of Common Pleas to the Superior Court where they were tried *de novo,* such county Courts of Common Pleas were said to be "inferior", to the Superior Court, in the sense that

their judgments might be annulled as a result of a retrial in the latter court. *LaCroix vs. Commissioners, supra.* Nothing said in the opinions in any of these cases is of assistance in resolving the instant question, which is: whether within the meaning of section 1 of Article Fifth of the Constitution a court of general, though limited, jurisdiction at law and in equity throughout the State is an inferior court which the Legislature may "ordain and establish."

The standard by which it is to be determined whether this is so or not are the powers and jurisdiction of "a superior court" for it is by comparison with that, as a trial tribunal, that the relative inferiority of such a tribunal is to be gauged. *LaCroix vs. Commissioners, supra,* p. 496; *Styles vs. Tyler, supra,* p. 452, id. p. 468; *Ansonia vs. Studley, Judge, supra,* p. 177. Certain distinguishing features possessed by a "superior court" as connoted by the tribunal established in fulfillment of the requirement that there shall be such a court (that is, the Superior Court) which contrast with those of "inferior courts", may be noticed. Among these is that of its permanence. Referring to section 1 of Article Fifth of the State Constitution: "Undoubtedly this provision requires that there shall always be in the State, two courts, one known as a Supreme Court of Errors, and one as a Superior Court. Undoubtedly, also, the Supreme Court of Errors must always be the court of last resort for the correction of errors of inferior judicial tribunals and the Superior Court must be a court of superior jurisdiction to such inferior courts as may from time to time be established." *Styles vs. Tyler, supra,* p. 468. (Dissenting opinion of Judge Baldwin.) By contrast, inferior courts, as creatures of the Legislature are inherently impermanent, since "one legislature cannot control the exercise of the powers of a succeeding legislature." *Preveslin vs. Derby & Ansonia Developing Co.,* 112 Conn. 129, 140, 151 Atl. 518. Another of its characteristics is its universality. It is one court throughout the State. *Fine vs. Wencke,* 117 Conn. 683, 684, 169 Atl. 58; *Mower vs. State Department of Health,* 108 id. 74, 77, 142 Atl. 473; *Allis vs. Hall,* 76 id. 322, 327, 56 Atl. 637; *Smith vs. Hall,* 71 id. 427, 42 Atl. 86; *Styles vs. Tyler, supra,* p. 450. No such quality attaches to inferior tribunals. Yet another feature by which it is characterized is that as a court of law it "is a court of general jurisdiction." *Ansonia vs. Studley, Judge, supra,* p. 177; *Cocking et al. vs. Greenslit,* 71 Conn. 650, 651, 42 Atl. 1000. This applies not

only to the amount of damages demanded or the value of the matter or thing in demand (*Cocking et al. vs. Greenslit, supra,* p. 651; *Town of Bridgeport vs. Blinn,* 43 Conn. 274), but, also, to the character of the alleged wrong and proceedings to remedy it, *State ex rel. Morris vs. Bulkeley,* 61 Conn. 287, 374, 23 Atl. 186; and to criminal, as well as civil matters. *Crandall vs. State, supra,* p. 365; *State vs. Gorham,* 11 Conn. 233; *State vs. Carroll,* 97 id. 598, 600, 117 Atl. 694; *State vs. Chin Lung,* 106 id. 701, 719, 139 Atl. 91, *and see, State vs. Elbert,* 115 id. 589, 599, 162 Atl. 769; *Perell vs. Warden of State Prison,* 113 id. 339, 343. In their very nature, inferior courts cannot possess this attribute since their jurisdiction rests with the General Assembly, subject to constitutional limitations.

The question whether the State Court of Common Pleas is an "inferior court" within the meaning of section 1 of Article Fifth of the Constitution presents itself in two different aspects, each of which involves the exercise of distinct powers delegated to the General Assembly. One of these relates to the authority reposed in the legislative branch to *define the powers and jurisdiction* of inferior courts validly created by that body; the other refers to the power to *ordain* courts. Since the answers to both of these require an interpretation of the Constitution they pose judicial questions. *State vs. Main,* 69 Conn. 123, 127, 128, 37 Atl. 80; *Preveslin vs. Derby & Ansonia Developing Co., supra,* p. 144. The quest is the sense in which the framers of the Constitution employed the term "inferior courts" as it appears in the context of section 1 of Article Fifth. *Water Commissioners vs. Curtis,* 87 Conn. 506, 509, 89 Atl. 189. The meaning to be sought is that which the language was intended to have when the Constitution was framed and adopted (*Borino vs. Lounsbury,* 86 Conn. 622, 627, 86 Atl. 597), in its then established significance. *Styles vs. Tyler, supra,* p. 450.

The Constitution (Article Second) divides the powers of government into three distinct departments—legislative, executive and judicial—and confides each to a separate magistracy. The legislative (Article Third) vests in a then unorganized General Assembly; the executive (Article Fourth) in a then unelected governor, and the judicial (Article Fifth) in a then unestablished judiciary. The instrument describes the character and composition of the bodies which together shall make up the General Assembly and exercise, when its membership is chosen, the legislative power. Palpably, a House of Repre-

sentatives and Senate were not created as ends in themselves, but only as they constitute the agencies by which the legislative power may be exercised. Similarly, the intention of Article Fifth is not primarily the creation, or the making of provision for the ordination, of courts. The obviously principal purpose is the creation of a judicature to receive and hold and which, when established, shall administer the judicial power of the State. Courts, as such, enter into this design only as they are instrumentalities essential to the exercise of such power. 14 Am. Jur. §3, p. 248. Article Fifth, however, is more than architect of the structure which it designs to house the deposit of judicial authority. It creates "a supreme court of errors" and "a superior court" (*Dexter Yarn Co. vs. American Fabrics Co.*, 102 Conn. 529, 538, 129 Atl. 527), and thereby builds into the edifice two elements which give it that form and character which is the realization of the constitutional conception. In this view the term "superior court" is not the name of a tribunal but the description of one of a character connoted by the adjective "superior." The establishment of such a court was an act that could only be performed by the General Assembly. "It is by legislative enactment alone that courts with their constituent elements of time, place and officers are brought into actual and real existence as contradistinguished from their existence solely under constitutional provisions." 14 Am. Jur. §21, p. 255; *White County vs. Gwin*, 126 Ind. 562, 577, 36 N.E. 237, 22 L.R.A. 402; *and see, Alcorn vs. Fellows, supra,* p. 29. The Constitution was adopted by the people at an election held on the first Monday of October, 1818, and at the session of the General Assembly convened immediately afterward in that month and year "a superior court" since known as the Superior Court was established. This was accomplished by the passage of an act entitled "An Act Constituting and Regulating Courts" (October Session, 1818, Chapter I) which, in substance, reduced the number of judges comprising the bench of the pre-constitutional superior court so that after "the first day of June next", it should consist of one chief judge and four assistant judges to be appointed for that purpose, who as a body should, also, constitute the Supreme Court of Errors (§1); and providing (§3) that the sessions of the Superior Court should be held at such times and places as "now by law provided" but by a single judge only. Public Acts of Connecticut, 1808-1820, p. 311.

The characteristic features of "a superior court" as that designation is used in Article Fifth are not those connoted by such words in any abstract sense, but, such as derive from their presence in the judicature of which a court of that description is made an essential part. Quite obviously, the judicature created in Article Fifth is the replica of that which existed when the Constitution was adopted. That, too, was composed of a Supreme Court of Errors, a Superior Court and inferior tribunals consisting of county, town and city courts and justices of the peace. In every material particular, the judicature visualized in Article Fifth is identical with that of immediately preceding pre-constitutional days which under the government inaugurated pursuant to that instrument is succeeded. The meaning of "a superior court" as it is used in section 1 of Article Fifth and the character and distinctive features of such a tribunal are to be found in that judicature of which it is a counterpart. "We are bound to interpret the constitution in the light of the law as it existed at the time it was adopted...." *State vs. Gaetano,* 96 Conn. 306, 311, 114 Atl. 82.

The judicature as it was when the Constitution became effective was completed when it was provided that the Supreme Court of Errors after the June, 1807, session of the General Assembly should consist of "the judges of the Superior Court for the time being" (Statutes of Conn., 1808, Chapter XIV, p. 218, entitled "An Act in further addition to and alteration of an Act for constituting and regulating courts", enacted in 1806) instead of the "Governor, Lieutenant-Governor and Council" as was the case when it was originally created in 1784. Statutes of Conn. 1796 ("An Act for continuing and regulating courts and appointing the Times and Places for holding the same") §19, p. 127. A superior court, however, had been in existence in that judicature under that designation since May 10, 1711 and a tribunal occupying a similar place in a judicature identical therewith, known as the Court of Assistants, which such Superior Court succeeded, since the grant of the Charter of Charles II in 1662. The description of the character of this tribunal contained in Colonial Records of Connecticut, vol. 5, pp. 238, 241, is that it shall be "a Superior Court of Judicature over the Colony...." Its jurisdiction of causes was stated to embrace "all pleas, real, personal or mixt, as well as all pleas of the crown and all matters relating to the conservation of the peace and punishment of

offenders, as civil causes, or actions between party and party, and between her Majestie or any of her subjects, whether the same do concern the realty and relate to any right of freehold and inheritance, or whether the same do concern the personalty and relate to matter of debt, contract, damage or personal injury; and also all mixt actions which concern both realty and personalty brought before them by appeal, review, writ of error or otherwise, as the law directs; (and generally of all other matters, as fully and amply to all intents and purposes whatsoever) as the court of assistants in this Colony heretofore might or could have; and are hereby impowred to give judgment therein and award execution thereon." The jurisdiction of causes exercised by the Court of Assistants to all of which the Superior Court thus succeeded was as follows: "....unto wch said Courts shalbe liberty of appeals from ye respective County Courts. Wch said Courts of Assistants are impowred to heare and determine such appeales as shalbe orderly presented as before. And likewise all Capitall Crimes respecting life, limb or banishment shalbe tried at those said Courts of Assistants." Appeals lay from this tribunal to the General Assembly, "wch appeale shal come only and immediately from the Court of Assistants vpon the issue there made." And "....in all appeales to ye Court of Assistants, the trialls there shalbe by a Jury if the nature of the case require...." and "....in appeales no evidence shalbe considered but such as have been presented at ye county Court." Colonial Records of Connecticut, vol. II, pp. 28, 29.

To the powers and jurisdiction of the colonial Superior Court as so conferred upon it and as they descended to it from the Court of Assistants, were specifically added, that of issuing the Writ of Prohibition against "....any other court held within the colony [which] do exceed their jurisdiction", and to render judgment in such a proceeding, "....as fully, absolutely and intirely as the Court of King's Bench in that part of Great Britain called England by law may do"; Col. Rec., vol. VIII, pp. 360, 361; also in adultery with trial by jury or otherwise. Col. Rec., vol. XIII, p. 296; and in equity which theretofore had been exercised by the General Assembly, only, where the matter or thing in demand exceeded 100 pounds and did not exceed 400 pounds. Col. Rec., vol. XIV, p. 329.

In the judicature as it was when, and had been for almost one hundred and ten years before the Constitution was adopted,

the character and distinctive features of "a superior court" are unmistakable. Aside from its greater prestige it was distinguished from all others in that (1) its jurisdiction of causes was general and embraced all in both criminal and civil matters either original or by appeal from the county courts (to which latter courts appeals came from the judgments of justices of the peace and from town courts); (2) it was the only court in the judicature whose jurisdiction included the entire colony under the Royal Charter, and the whole State after the Declaration of Independence was proclaimed.

Nor was this position in the judicature of the near preconstitutional period a merely adventitious one. The essential features of the judicature as it was when the Constitution became the organic law of the State were identical with those which marked it without deviation at any time, from the earliest beginnings of government in Connecticut. Until the colony, in company with the other 12, severed its political ties with Great Britain upon the proclamation of the Declaration of Independence, its affairs were at all times administered by an elective representative body. This during the period following the adoption of the Fundamental Orders on January 14, 1638, and ending with the acceptance of the Charter of Charles II, in 1662 was the General Court; under the Royal Charter, from 1662 until within October, 1776, it was the General Assembly and, thereafter, until the State Constitution was adopted in 1818, a like body of the same name which assumed to exercise authority like unto that conferred upon the General Assembly described in the Royal Charter even after that had been repudiated and, equally, without any sanction from the people except as may be inferred from their sufferance and acquiescence. In these several representative bodies throughout the entire period from 1638 to 1818, the complete power of the State—legislative, executive and judicial—reposed, and was by them exercised. The government, during all this time was a government of men—even though chosen by the people—and at times betrayed all of the tyranny which the possession of absolute power and the despotism ever associated with concentrated authority unlimited by organic law, has never failed to produce. The yearnings of the people for a government of law—or, at least, of men restrained by law—first shown by guessing flashes of timid reachings and later by conceptualism translating into shaping policy for an orderly administration of the judicial power was reflected in a

tendency manifested by the General Court and continuing to assume more definite form as time passed in the policies of the representative assemblies which succeeded it, to delegate more and more of their judicial functions to bodies which they called courts. Throughout the whole period, however, while occasionally interfering directly, the General Court in its time and the General Assemblies thereafter, until the creation of the Supreme Court of Errors in its original form in 1784, reserved the exercise of the power to set aside and modify the judgments of the trial courts, to themselves. In this, they played the role of a court of final resort by appeal from what may be called the state trial court. This latter, in the days preceding the acceptance of the Charter of Charles II was known as the Particular Court and was established practically coincidentally with the adoption of the Fundamental Orders. Its jurisdiction of causes is difficult of definite ascertainment in extant records but according to historians of the period was broad. Below it were courts established in such communities as were organized as towns and justices of the peace. The same function was performed by a body called the Court of Assistants when the Royal Charter became the organic law— and continued to be until it was succeeded by another described as a Superior Court in 1711. The judicature as it was when the Constitution was adopted was complete with the establishment of the Supreme Court of Errors in the form in which it was constituted in 1806. Thus, almost from the day that the separatists from the Massachusetts Bay Colony met to adopt Hooker's plan for selfgoverning commonwealth, the developing judicature followed a uniform plan, the chief and distinguishing characteristic of which was—one trial court of legal and, later of both legal and equitable causes, of general jurisdiction throughout the whole state; above it a court of final resort on appeal; and below it, courts having general, though restricted jurisdiction, civil and criminal in the local political subdivisions where they had been established. On the premise stated, *supra,* that the judicature created in Article Fifth of the Constitution incorporates the distinctive features of the judicature existing when it was adopted, and that the term "a superior court" therein signifies a tribunal of essentially' the same character and occupying the same position in the judicature as in that which it succeeded, it is manifest that it defines a court of general jurisdiction for the whole State, and the *only court of that rank,* and possessing these two fea

tures in combination, in the judicature.

The mere circumstance, in itself, that a constitution re-quires that there shall be a court of such grade and character in the judicature created by it does not necessarily preclude the presence of power in the legislature to ordain others of the same rank and identical jurisdiction of causes and in territory. But its authority in this respect derives from, and is limited by, the Constitution. Where such broad power is conferred, the state constitution usually vests it in a supreme court, one or more designated trial courts and such "*other courts*" as the legislature may create. Under provisions of such purport, it is held that the legislature is authorized to ordain such tribunals as it may deem desirable, the jurisdic-tion of causes and in territory of which may be equal to any of the named courts except that of the Supreme Court. *White County vs. Gwin, etc.,* 136 Ind. 562, 573, 36 N.E. 237, 22 L.R.A. 402; *Mills vs. Brown,* 31 Utah 473, 477, 88 Pac. 609, 120 Ann. St. Rep. 935; *Woods vs. McCoy, Treas.,* 144 Ind. 316, 321, 322, 43 N.E. 269, 33 L.R.A. 97; *Heirs of Ludlow vs. Johnston,* 3 Ohio 553, 563, 17 Am. Dec. 609; *Commonwealth ex rel. Attorney General vs. Hipple,* 69 Pa. St. 9; *Gottschall vs. Campbell,* 234 Pa. St. 347, 351, 83 Atl. 286. So, also, where the constitutional provisions name or describe a court which shall be the supreme court and one or more trial courts in which the judicial power shall vest and empower the legis-lative body to create courts "inferior" or "others inferior" to the *supreme court,* as it may determine, it is the concensus of authority that the only limitation upon the exercise of such power is that the tribunals created be inferior to the supreme court. Within the bounds of such a delegation the legislative body may ordain any number of courts which it may deem necessary, any one or more of which may be equal in jurisdic-tion of causes and territorially to any of the tribunals named or described in the constitution. *Clark vs. Black,* 136 Ga. 812, 815, 72 S.E. 751; *Morris vs. Bunjan,* 58 Kans. 210, 212, 48 Pac. 864; *Burks vs. Walker,* 25 Okla. 353, 356, 109 Pac. 544; *State vs. Fuller,* 147 Ala. 164, 171, 41 So. 990; *Woods vs. McCoy, Treas.,* 144 Ind. 316, 321, 43 N.E. 269, 33 L.R.A. 97; *Ex Parte Lothrop,* 118 U.S. 113, 118, 30 L. ed. 108, 6 Sup. Ct. 984. But see, *Rhyne vs. Lipscombe,* 122 N.C. 650, 652, 653, 29 S.E. 57; *Tate vs. Commissioners,* 122 N.C. 661, 663, 665, 29 S.E. 60; *Mott vs. Commissioners,* 122 N.C. 866, 875, 876, 36 S.E. 330, and *Jones vs. Standard Oil Co. of N. J.,* 202

N.C. 328, 334, 162 S.E. 741. Where, however, the constitution vests the judicial power, as does that of Connecticut, in a supreme court, a superior court, justices of the peace and such inferior courts as the legislature may create, the legislative body is without authority to create any court equal in rank with or such as infringes upon the jurisdiction and powers of the "superior court." *State ex rel. Fugita vs. Milroy, etc.,* 71 Wash. 592, 120 Pac. 384; *State ex rel. Lytle vs. Superior Court,* 54 Wash. 378, 384, 103 Pac. 464; *State ex rel. Rogers vs. Burton et al. (State vs. LaCross County Judge),* 11 Wis. 50, 54; *Conger vs. Convery,* 52 N.J.L. 417, 443; *People ex rel. Swift vs. Luce,* 204 N.Y. 478, 99 N.E. 850, Ann. Cas. 1913c, 1151; *Sill vs. Village of Corning,* 15 N.Y. 297, 299, 300; *Decker vs. Canzoneri,* 9 N.Y.S. (2d) 210, 214, 215, 256 Appel. Div. 68; *and see, State vs. Eychaner,* 41 N.M. 677, 678, 679, 73 Pac. (2d) 805; same title, 41 id. 683, 73 Pac. (2d) 809.

The conclusion is that the provisions of Article Fifth, in providing that the judicial power shall vest in part in a "superior court" means that there shall be in Connecticut but one and only one trial court of general jurisdiction of causes having territorial jurisdiction throughout the entire State. *Smith vs. Hall,* 71 Conn. 427, 431; *State ex rel. Lytle vs. Superior Court,* 54 Wash., *supra,* p. 384 (where the Constitution made the counties the judicial units and provided for "a superior court" in each of them and it was held that the legislature was without power to create an additional superior court in any of them). The opinion in *Sill vs. Village of Corning,* 15 N.Y. 297, 299, 300, is very much in point in support of the conclusion stated. The constitution interpreted therein described the Supreme Court of that state as one of general jurisdiction at law and in equity. This tribunal occupied the same relative position in the judicature of New York as "a superior court" does under the Connecticut Constitution—that is, that of a trial tribunal of general jurisdiction throughout the whole State. *Fine vs. Wencke,* 117 Conn. 684; *Mower vs. State Department of Health,* 108 id. 77; *Allis vs. Hall,* 76 id. 327; *Smith vs. Hall,* 71 id. 427; *Styles vs. Tyler,* 64 id. 450. Of the character of such Supreme Court and its status in the judicature created in that constitution (p. 299) it was said: "I am of the opinion that the provision respecting the higher courts whose jurisdiction pervades the whole state is exclusive in its character and that no other courts of the same character

can be added by the legislature...." This was followed and emphasized in *People ex rel. Swift vs. Luce,* 204 N.Y. 478, 486, 487, 99 N.E. 850. *See, also, Landers vs. Staten Island R.R. Co.,* 53 N.Y. 450, and *People ex rel. Ryan vs. Green,* 58 N.Y. 295, 300. Specifically, it is held that under a constitution containing such provisions, "the legislature was without power to create a new court with statewide jurisdiction." *People ex rel. Swift vs. Luce,* 204 N.Y. 478, 486, 487; *Decker vs. Canzoneri,* 9 N.Y.S. (2d) 210, 214, 215, 256 Appel. Div. 68.

However, the conclusion that the General Assembly is without power to ordain a court of general jurisdiction territorially co-extensive with the state boundaries need not rest alone on the historical or legal conclusions stated *ante.* The proceedings of the Convention which framed the Constitution disclose that a provision in substitution for section 1 of Article Fifth under which the general Assembly would have possessed power to create such courts as it might please, inferior only to "a supreme court of errors" was rejected. The draft of Article Fifth submitted by the committee charged with preparing it was presented for consideration on September 9, 1818 (Journal of the Convention, p. 39) and with the exception of the differences in capitalization and punctuation as noted *supra,* read as finally adopted. At the session of the Convention held on September 15, 1818 (Journal of the Convention, p. 67), one of the delegates moved "....to amend the 1st section of the Fifth Article by striking out the words, of errors, a superior court" and to insert in lieu thereof the words "which shall consist of a chief judge and not more than four other judges." Had this proposed amendment prevailed, section 1 of Article Fifth would have read as follows: "The judicial power of the state shall be vested in a supreme court of errors which shall consist of a chief judge and not more than four other judges and such inferior courts as the General Assembly shall from time to time ordain and establish. The powers and jurisdiction of which courts shall be defined by law."

Under such a provision, as previously noted, the relative inferiority of the courts which the General Assembly would have been authorized to create would be gauged by comparison with that established as a "supreme court of errors" instead of that of "a superior court" and would, hence, include all of the trial courts. As the power of the Legislature concerning

the necessity for such courts as it creates within the limits of the authority conferred upon it, is plenary, the General Assembly, under such a delegation of power, could ordain any number of tribunals which it might elect, confer upon them such powers and jurisdiction as it might see fit and among them create any number of courts of equal rank and grade and of statewide jurisdiction. The only limitation would have been that such tribunals be inferior to a supreme court of errors.

The issue presented to the Convention by the offer of the amendment quoted, plainly left it to that body to determine whether the Constitution which they were formulating should repose in the General Assembly complete authority to determine the character of the courts, as well as their powers and jurisdiction, which should compose the judicature under it or whether its power should be limited to the creation of such tribunals only as should be inferior to "a superior court." The proposed amendment was rejected and the design of the judicature left it as it was in the original draft submitted to the Convention, which is as it appears in the Constitution as quoted *supra*. This, as is evident, provides for one State trial court, only (i.e. "a superior court") and reposes in the Legislature the power to ordain only such tribunals as are inferior to that.

Implementing the provisions of section 1 according to the interpretation given it here, are the provisions of section 3 of Article Fifth. Therein it is provided that: "The judges of the Supreme Court of Errors of the superior and inferior courts and all justices of the peace shall be appointed by the General Assembly, in such manner as shall by law be prescribed." None of the amendments made to Article Fifth since the Constitution was adopted affect it in so far as the instant questions are concerned, and so are not noticed. Under this section, the Legislature is authorized to prescribe the number of judges who shall compose the bench of "a superior court" from time to time, as well as to provide for the manner in which they shall be named. The power to increase or decrease and thus to regulate the number of these according as the demands upon the court expand or contract manifestly obviates all necessity for the creation and establishment of another court of the same character or jurisdiction. It has been held that the presence of such authority in the legislature as it respects a court created in a constitution deprives the legis-

lature of the power to create a court additional to such constitutional tribunal in the same territory and restricts it to the appointment of additional judges to such constitutional court if the increase of litigation requires a greater number of court sessions. *State ex rel. Lytle vs. Superior Court,* 54 Wash. 384, and see, *Rhyne vs. Lipscombe,* 122 N.C. 658, 659.

No other conclusion seems admissible than that in creating "a superior court" in section 1 of Article Fifth, the Constitution intends that such tribunal shall be one of general jurisdiction of criminal and civil causes at law and in equity throughout the whole State and that it shall be the only court of that character in the judicature; and that by the same token and necessary implication "such inferior courts" as the General Assembly is empowered to ordain and establish shall be solely such as the jurisdiction of which, territorially, shall be local, only, as for example, restricted to a county, town or district where the tribunal is established. The State Court of Common Pleas created in the act in question purports to be a court of general and statewide jurisdiction and as such a counterpart of "a superior court." The fact that it is given a different name cannot change its character. *Rhyne vs. Lipscombe,* 122 N.C. 657. "It certainly was not contemplated that the legislature should be empowered to create any similar courts though with different names." *People ex rel. Swift vs. Luce,* 204 N.Y. 487. It differs from a superior court in its powers only in that its exclusive jurisdiction of the causes of which it is given cognizance is limited in the amount of damages demandable in actions at law and in the value of the matter or thing in demand in equity to $2,500. In its exclusive jurisdiction of appeals from zoning boards of appeal; from the Liquor Control Commission and all appeals from the doings of any municipal board, officer or commission it exercises powers touching some of the most important matters which may be presented to any court while its exclusive jurisdiction in foreclosures up to and inclusive of $2,500 and its unlimited concurrent jurisdiction in such actions above that figure encompasses the entire field of important causes of that kind. A court of this character is not an "inferior court" within the intendment of section 1 of Article Fifth of the Constitution and the General Assembly was hence without power to ordain and establish it. It follows that the act entitled "An Act creating a Court of Common Pleas for the State of Connecticut" (Conn. Public Acts, 1941, vol. 1,

chapter 286, p. 869) is void in all of its provisions. The State Court of Common pleas for which it provides never, therefore, came into legal existence. There can be no such thing as a *de facto* court. *Norton vs. Shelby County,* 118 U.S. 425, 30 L. ed. 178, 6 S. Ct. 1121.

It is evident, however, that the intention of the Act was not to terminate, in any event, the existence of the several Courts of Common Pleas or that established in the District Court of Waterbury which existed when it was passed. The legislation makes it clear that the repeal of the statutes ordaining, establishing and constituting these was incidental only to the creation of the State Court of Common Pleas. Under such circumstances, since this essential objective of the Act failed of its purpose because of its unconstitutionality, those provisions in it which provide for the repeal of the statutes creating the several Courts of Common Pleas and all others relative thereto are ineffective. "Ordinarily where one statute specifically repeals another and attempts unconstitutionally to provide a substitute, the provision of repeal will fall with the act of which it is a part. The question in every case is whether the legislature intended that the repeal should take effect in any event; that is whether the repeal provision is severable." 102 *A.L.R. Annotation,* p. 803. "Unless it employs language showing an intent to repeal in any event and irrespective of its unconstitutional provisions, an act which is invalid, or unconstitutional and void or inoperative does not repeal another valid act....So where an act expressly repealing another act and providing a substitute therefor is found to be invalid, the repealing clause, must, also, be held to be invalid, unless it shall appear that the legislature would have passed the repealing clause even if it had not provided a substitute for the Act repealed." 59 C.J. §552, pp. 939, 940. To same effect, 25 R.C.L. §166, p. 913. This is, also, true of invalid repeals by implication. 59 C.J., *supra.* This, notwithstanding the provisions of section 6568 of the General Statutes, Revision of 1930, which palpably apply only to valid repeals. The courts in question, it follows, remain existent as functioning tribunals as they were before the passage of the Act and competent to exercise such jurisdiction as had then been validly conferred upon them. Patently, the rules quoted apply to section 50f of the 1941 Cumulative Supplement to the General Statutes which affects to deprive the Superior Court of jurisdiction of appeals from zoning boards

of appeal by amending section 429, *supra,* as contained in section 63 thereof. It follows that section 429, *supra,* remains as it was when the Act in question was passed and that the Superior Court at all times since then had and now has jurisdiction, to hear and determine the issues involved in the instant proceeding.

The foregoing is concerned with the power of the General Assembly to ordain a court of the same *character,* or one having its identifying features, as that of a superior court. The remaining question—which, if the conclusions reached *supra,* are sound, becomes academic—is, whether, on the assumption that the Legislature had power to create the State Court of Common Pleas, it, also, possessed authority, in defining the powers and jurisdiction of such a tribunal, to exclude a superior court from jurisdiction of appeals from zoning boards of appeal. There are two situations in either of which, if it existed, the General Assembly would have such power. Neither of them obtain under the Constitution of Connecticut. The first would assume that the general jurisdiction of a superior court is conferred by the Constitution but would hypothesize that, since appeals from zoning boards of appeal are of statutory origin, such a proceeding may be made cognizable by any court which the Legislature may designate; the second would theorize that even though an appeal from the doings of a zoning board of appeal is such a proceeding as falls within the cognizance of a court of general jurisdiction, nevertheless, the General Assembly possesses power to define what portion of the whole judicial power a superior court may exercise and in the performance of that function may exclude it from jurisdiction of such a proceeding. As concerns the first, there is this statement to which some of the cases subscribe: "Where the legislature creates special statutory proceedings involving *rights* previously unknown to law and equity and providing remedies therefor, the legislature may confer jurisdiction thereof on any court to the exclusion of others....but it cannot in doing so take away the constitutionally protected jurisdiction of other courts in so far as it is applicable to the controversy involved." 21 C.J.S. §122, p. 187; *Grimes vs. Department of Public Instruction,* 324 Pa. St. 371, 377, 378, 188 Atl. 337. The expression quoted apparently rests upon the distinction which some courts make between jurisdiction of causes and proceedings known to the common law and those invented by legislatures for special purposes and which are

hence, unknown to the common law.· *Ashlock vs. Ashlock,* 360 Ill. 115, 121, 195 N.E. 657. It predicates on the conception that the general jurisdiction with which a court created by a state constitution is invested, means general jurisdiction, only, of causes at common law. The premise is not accepted in Connecticut. In this State, the principle of the common law that the courts afford a remedy for every wrong, is applied. When necessity arises for the intervention of the courts and there is no procedure of conventional character available to serve the exigency, the judicial function will not on that account, be frustrated—it will take cognizance of the wrong and prescribe a remedy appropriate and effective to enjoin its continuance or redress its consequences. But the pertinent consideration here is that the tribunal exercising jurisdiction under such circumstances is a superior court, because: "The Superior Court of this state, as a court of law, is a court of general jurisdiction. It has jurisdiction of all matters expressly committed to it and of all others cognizable by any law court of which the exclusive jurisdiction is not given to some other court. The fact that no other court has exclusive jurisdiction in any matter is sufficient to give the Superior Court jurisdiction over that matter." *State ex rel. Morris vs. Bulkeley,* 61 Conn. 374. The "right" involved in an appeal from a zoning board of appeal is one recognized by the common law. It has to do with one of the attributes which attend the ownership or possession of real property in the special aspect of interference with its use by public authority in administration of the police power. The jurisdiction of such a dispute, in Connecticut, is in a superior court. If this would not otherwise be so, it came to be there because that tribunal was created as a court of general jurisdiction. That character it acquired as held *supra,* because it occupies the same place under the constitution as the court which it succeeded did in the pre-constitutional·era. Specifically, this latter tribunal was vested with jurisdiction "of actions.... between her majestie or any of her subjects....whether the same do concern the realty....or whether the same do concern the personalty...." (Col. Rec., vol. 5, pp. 238, 241)— a plain delegation of power to determine the rights of individuals as against the sovereign. The jurisdiction to decide causes between persons and the State thus inheres in the Superior Court created by the Constitution in full measure as it existed in its predecessor of pre-constitutional days. It

has been so frequently recognized that no citation of authori-
ties is necessary. The right involved is that of freedom from
the unwarranted aggressions of public officials in enforcing
the police power. The test of its violation is whether the
conduct complained of is arbitrary, illegal or unreasonable.
When it is, the law will afford relief from its negative exer-
cise by mandamus and will restrain its affirmative display
by injunction. The appeal from the doings of zoning boards
of appeal is effective to justify relief only where the same
kind of violation of the identical right as defined by a similar
test is found to occur, that is, where the conduct complained
of is arbitrary, illegal or unreasonable. This identifies it as
but a simpler, readier and equally as efficacious a remedy for
the violation of the same right as·the common law recognized
and for the redress of any violation of which it was amply
equipped with remedies of its own. The mere circumstance
that the Legislature saw fit to provide a procedure of its own
to aid in· its protection is incompetent to deprive a court
having jurisdiction of such a wrong to hear and determine a
cause involving it, unless the General Assembly possesses
power to define the jurisdiction of such tribunals and the
withdrawal of cognizance of it is referable to the exercise of
such authority.

Even if the right of appeal from zoning boards of appeal
provided by section 429, *supra,* could be held to constitute a
new *right* or cause of action, the same result would obtain.
As observed, *supra,* the position of the Supreme Court in the
judicature of New York was the same as the Superior Court
in the judicature of Connecticut at the time that *People ex
rel. Swift vs. Luce,* 204 N.Y. 478, was decided. It was there
held (id. p. 488) in effect, that the tribunal by reason of its
general jurisdiction of causes, acquired jurisdiction of every
new right or cause of action, created by the legislature: "if
a claim is made litigable at all, that is to say if made the sub-
ject of a suit or litigation in a court of law, then under the
express provision of the Constitution, the jurisdiction of the
Supreme Court attaches at once....Nor if it were conceded
that a new cause of action has been created, would that em-
power the legislature to withdraw the cause of action from
the Supreme Court and constitute another court for its de-
termination. Doubtless, the legislature may create new causes
of action, but when created, the jurisdiction of the Supreme
Court attaches." To same effect, *People ex rel. Crane vs.*

*Hahlo,* 229 N.Y. 309, 319, 127 N.E. 402; *Conger vs. Convery,* 52 N.J.L. 443; *and see, Wheeler vs. N. Y., N. H. & H. R.R. Co.,* 70 Conn. 326, 328, 39 Atl. 443, and *O'Brien's Petition,* 79 id. 46, 59, 63 Atl. 777; *Waterbury Blank Book Mfg. Co. vs. Hurlburt,* 73 id. 715, 717, 49 Atl. 198.

Whether, therefore, the appeal from zoning boards of appeal afforded by section 429, *supra,* be viewed as the creation of a right unknown to the common law or as a merely new procedure to effectuate a remedy for the violation of a right known to the common law, it constitutes in the one case, and in the other relates to, a cause of important and substantial character and is, hence, within the cognizance of a superior court as a court of general jurisdiction for the whole State.

There is authority to the effect, generally, that a legislature may not confer upon a tribunal ordained by it, jurisdiction of causes concurrent with that of a constitutionally created tribunal to which it is made inferior by a constitution. *Conger vs. Convery,* 52 N.J.L. 443; *Houston vs. Royston,* 7 How. (Miss.) 543; *State vs. LaCross County, Judge,* 11 Wis. 50; *Re Lothrop,* 118 U.S. 113, 30 L. ed. 108, 68 S. Ct. 984, An. Cas. 1913C, 1161. The instant cause calls for no decision on that score. The inquiry here, as it is stated, *supra,* is not whether the General Assembly may so define the jurisdiction of inferior courts as to confer jurisdiction of causes upon them, concurrent with a state superior court of general jurisdiction, but solely whether the General Assembly in the exercise of its power to define the jurisdiction of courts established by it may *exclude* a superior court of cognizance of any cause forming part of its general jurisdiction. Obviously, that involves the query whether power to define the jurisdiction of the superior tribunal reposes in the Legislature. Palpably, in the absence of any judicial power of its own, if the General Assembly has authority to define the jurisdiction of causes cognizable by a superior court it could acquire it only under the last phrase in section 1 of Article Fifth of the Constitution, viz., "the powers and jurisdiction of which courts shall be defined by law." Interpreting this provision in *Styles vs. Tyler* and again, in *Enfield vs. Ellington,* both *supra,* a majority held that it did not apply to a supreme court of errors because that tribunal acquired its jurisdiction from the Constitution itself as identical with that exercised by the court of the same name which was in existence when the Constitution was adopted. The unavoidable implication of that hold-

ing is that the jurisdiction of a superior court, since, it, also, is created by the Constitution and the reference to it occurs in the same context and relation as does that to a supreme court of errors, is, likewise, defined therein as identical with that exercised by the tribunal occupying the same place in the pre-constitutional judicature, viz., that of a court of general juris-diction for the entire State. The connoted conclusion is that the phrase "the powers and jurisdiction of which courts shall be defined by law" in section 1 of Article Fifth, relates only to inferior courts which the General Assembly is em-powered to "ordain and establish", and that that body has no authority to define the jurisdiction of a superior court. Even though, however, under the phrase mentioned it could be said that power is delegated to the Legislature to define the jurisdiction of a superior court it would be subject to the limitation that it be so exercised as not to affect the character or status of that tribunal as the Constitution fixes it in the judicature as a court of general jurisdiction throughout the whole state superior to all others except that of a supreme court of errors. *Styles vs. Tyler,* 64 Conn. 470 (dissenting opinion of Judge Baldwin). On any theory, therefore, the General Assembly lacks power to define the jurisdiction of the Superior Court in such manner as to exclude it from cog-nizance of causes within the range of a court of general jurisdiction.

While all this seems evident, the decisive consideration is not the *conclusion* reached in *Styles vs. Tyler, supra,* but the more fundamental one of that upon which the determination there arrived at, pivots. Patently, the perfection of a court as a functioning institution requires the coincidence of three elements. The first is its creation, which is its existence as a mere entity or conception; the second is its establishment which consists of the appointment of judges to preside over its ses-sions, and a specification of the times when and places where it is required to be open for the trial of causes, together with such procedural regulations as may be properly prescribed; the third is a description of its powers and jurisdiction. "Some constitutions establish a number of designated courts, vest them with judicial power and apportion jurisdiction among them. Such constitutional grants, except as they may reserve some of the judicial power and delegate its distribution or ap-portionment, dispose of the whole of such power residing in the sovereignty, leaving none at the disposal of the legislature

and the courts so established constitute a coordinate and independent judicial department of the government." 21 C.J.S. §122, p. 181. Where, however, as in the case of the Connecticut Constitution, and in a great many throughout the country, certain courts are named or otherwise designated but the Constitution is silent as respects the powers and jurisdiction which each shall exercise, the source of these becomes a matter for interpretation of the particular instrument. Admittedly, a superior court is created by the Constitution; concededly, its establishment in the sense referred to, *supra,* depends upon legislative enactment; whether its powers and jurisdiction are granted to it in the Constitution which creates it or may only emanate from legislative enactment, depends upon the meaning and implications of the pertinent constitutional expressions. Such provisions, generally, and for present purposes, may be viewed as falling into two different categories which are: (a) those in which the courts named or described in the constitution as composing the judicature are created only in the sense of entities and are endowed with no faculties, except the capacity to receive jurisdiction from the legislature. *Cummins vs. Kinsinger,* 24 Ohio, N.P.N.S. 34; and (b) those in which the tribunals named or designated therein are not only created by, but are, also, granted the jurisdiction which may be exercised by them, directly from the constitution, whether expressly or by implication.

Within the class first mentioned was the constitution of Ohio interpreted in *Heirs of Ludlow vs. Johnston,* 3 Ohio, 541, 563, in which that instrument vested the judicial power "in a supreme court of errors, courts of common pleas for each county, in justices of the peace and in such other courts as the legislature shall from time to time establish" and which, also, contained a provision to the effect that the several courts shall have jurisdiction in such cases as may be specified by law. Of these provisions it was said: "Hence, it is manifest that although the constitution provides that there shall be a supreme court and courts of common pleas, yet it was not the intention of the framers of the instrument to organize these courts or confer upon them any specific jurisdiction. Their organization, the extent of their power, the nature of their duties and the manner in which this power and those duties are to be exercised and performed are all left to be provided for by future legislation." To same effect, *Geiger vs. Geiger,* 117 Ohio St. 451, 459, 160 N.E. 28; *Commonwealth vs. Leach,* 246 Mass.

470, 141 N.E. 301 (where the constitution interpreted confers the power to define jurisdiction upon the legislature in express terms); *and see, First National Bank of Albuquerque vs. Dunbar,* 32 N.M. 419, 425, 258 Pac. 817.

The other class is exemplified by the effect attributed to the constitutional provisions in point of not only creating the named or described courts, but, of, also, granting jurisdiction to them. Examples of state constitutional provisions having this effect as well as the reasons upon which the conclusions stated in them are based are among others illustrated in the excerpts from the opinions in the cases which follow: In *Conger vs. Convery,* 52 N.J.L. 417, 439: "By the Constitution of this state the judicial power is declared to be vested 'in a Court of Errors and Appeals in the last resort in all causes, as heretofore; a court for the trial of impeachments; a Court of Chancery; a Prerogative Court; a Supreme Court; Circuit Courts, and such inferior courts as now exist, and as may be hereafter ordained and established by law, which inferior courts the legislature may alter or abolish, as the public good may require.' It will be observed that, in this description, no attempt is made to define the authority or jurisdiction of the several courts thus designated; and yet it is not to be denied that the boundaries of the power thus deposited in these several tribunals have always been deemed to be as plainly demarked, by implication, as they could have been by the most exact definition. And the reason of this is obvious, for each of these judicial institutions, with the exception of the county courts, and those subordinate establishments, styled inferior courts, has descended to us from the Proprietary and Provincial governments, with no observed change except as to their modes of procedure and inasmuch as each of them is the exact counterpart of an English original, the particular jurisdiction of each is readily ascertainable by the reference to the tribunal of which it is a copy....In view of such a condition of affairs, it does not seem questionable that every one of these chief constitutional tribunals, as they at present exist in this state, has its powers defined with certainty and exactness." Of the grant of general jurisdiction to the Superior Courts of North Carolina as indicated by that name, in the constitution of that state examined in *Mott vs. Commissioners,* 126 N.C. 866, 870, 871, 36 N.E. 330, the opinion states: "The Constitution, Art. IV, sec. 2, establishes a Supreme Court, Superior Courts and Courts of Justices of the

Peace. Article IV, sec. 8, defines the jurisdiction of the Supreme Court and Art. IV, section 27, defines the jurisdiction of courts of Justices of the Peace. But the jurisdiction of the Superior Courts is nowhere defined in the Constitution. . . . Their constitutional jurisdiction, then, is to be found to include everything below the Supreme Court and above the Courts of Justices of the Peace. These courts are established by the Constitution, and have their constitutional jurisdiction defined, of which they cannot be deprived by the Legislature. . . . But as there is no express grant of jurisdiction to the Superior Courts in the Constitution, it remains to be seen what that jurisdiction is. . . . This jurisdiction is to be found in the fact that these courts—Superior Courts—are not creatures of the Constitution, but adoptions of the Constitution. The Constitution found them here, established institutions, with their jurisdiction well known and established, and the Constitution, not wishing to make any change as to the jurisdiction of these courts, simply adopted them as they were. . . . We say these courts—these Superior Courts—were here before the Constitution and became constitutional courts by adoption and without any change or modification as to jurisdiction. . . ." Of the manner in which the Supreme Court of New York came to have its general jurisdiction, it is written: "The original of the Supreme Court was through a statute passed by the legislature of the Colony of New York on the 6th day of May, 1691. 'This act founded the supreme court. . . . Not only did this act erect the tribunal which still continues the great law court of the state, but it vested in it a jurisdiction which change of government and constant reforms and revolutions in procedure have been powerless to abridge in any material respect. . . .' The Constitutions of 1777 and 1821 did not create or continue the Supreme or Chancery courts but treated them as existing. In the Constitution of 1846, it was declared that there should be a Supreme Court 'having general jurisdiction in law and equity.' Art. 6, §3. In the Constitution of 1894, the Supreme Court was continued. . . . The Constitution now in force provides: 'The Supreme Court is continued with general jurisdiction in law and equity. . . .' State Constitution, section 1, Art. 6." *Decker vs. Canzoneri,* 9 N.Y.S. (2d) 214, 215. In Connecticut, as observed, *supra,* the Constitution adopted in 1818 created a judicature which was the counterpart of and characterized essentially by the features which had distinguished the judicial system from the beginning of government here. The Legislature in establish-

ing the courts created therein—that is a Supreme Court of
Errors and a Superior Court—simply continued in existence
the pre-constitutional Superior Court. It made no change
in it, except to provide that from and after June 1, 1819, its
business should be administered by "one chief judge and four
assistant judges to be appointed for that purpose" who should,
also, compose a supreme court of errors. (An Act consti-
tuting and regulating Courts, October Session, 1818, Chapter
1, Public Acts of Connecticut, 1808, 1820, Book II, p. 45.)
No definition of the jurisdiction of either a supreme court of
errors or of a superior court was affected to be then made and
no reference thereto appeared in any legislative act thereafter
until the Revision of 1821. (Statute Laws of 1821, "An Act
for constituting and regulating Courts and for appointing the
times and places of holding the same." Title 21, p. 136.)
The jurisdiction of a supreme court of errors as therein de-
scribed (section 3) is the same as the like tribunal possessed in
the pre-constitutional judicature (Acts and Laws of the Gen-
eral Assembly, 1796, p. 127), and that of a superior court,
except for inconsequential differences, the same as that of the
Superior Court created in 1711. The significance of the
conclusion reached in *Styles vs. Tyler, supra,* in so far as the
question here examined is concerned, is not so much in its
determination that the jurisdiction of a supreme court of
errors is granted to it directly by the Constitution—though
that implies much—but in the holding of which that conclu-
sion is the consequence—that is the rejection of the concep-
tion that Article Fifth merely creates the courts which it
designates and delegates to the General Assembly the power
of defining their jurisdiction coupled with the necessary con-
clusion that that Article not only ordains such tribunals but
grants to each the jurisdiction which they shall respectively
exercise. *Styles vs. Tyler,* 64 Conn. 443, 450. The principle,
in so far as it applies to a supreme court of errors, has been
applied without qualification or modification since its an-
nouncement. *Enfield vs. Ellington,* 67 Conn. 466; *Atwater
vs. Morning News Co.,* 67 id. 504, 527, 34 Atl. 865; *Nolan
vs. N. Y., N. H. & H. R.R. Co.,* 70 id. 159, 174, 39 Atl.
115; *Hoadley vs. Savings Bank of Danbury,* 71 id. 599, 613,
42 Atl. 667; *Dexter Yarn Co. vs. American Fabrics Co.,* 102
id. 538. Inevitably, it is determinative that the final phrase
in section 1 of Article Fifth (that is, "the powers and jurisdic-
tion of which courts shall be defined by law") does not apply

to a superior court, as a constitutionally created tribunal any more than it can to a supreme court of errors. It is, moreover, confirmed by the fact noted, *supra,* that the Convention which formulated the Constitution rejected provisions in substitution for those which appear in section 1 of Article Fifth which would have delegated power to the General Assembly to create any, and any number of courts which it might deem necessary and to define their jurisdiction as it might see fit with no limitation upon the exercise of its discretion in that regard, except that any so ordained be inferior to a supreme court of errors. From which it obviously follows that since, as concluded, *supra,* appeals from zoning boards of appeal are within the general jurisdiction of a superior court as a constitutional tribunal, the General Assembly has no power to exclude that tribunal from cognizance of such proceedings by attempting to define the jurisdiction of that court. *Jelke Co. vs. Beck,* 208 Wis. 650, 660, 242 N.W. 576; *Hedden vs. Hand,* 90 N.J. Eq. 583, 595, 107 Atl. 285, 5 A.L.R. 1463; *Conger vs. Convery,* 52 N.J.L. 443; *Aucutt vs. Aucutt,* 122 Tex. 518, 523, 62 S.W. (2d) 77, 88 A.L.R. 1198 (where jurisdiction of actions for divorce was expressly conferred in the state constitution); *DeHart vs. Hatch,* 3 Hun. 375, 381; *People ex rel. Swift vs. Luce,* 204 N.Y. 187, 188; *Decker vs. Canzoneri,* 9 N.Y.S. (2d) 214; *Mott vs. Commissioners,* 126 N.C. 875.

For reasons indigenous to the history and development of the pre-constitutional judicature of Connecticut and comparable to the same considerations as led to like conclusions in *Conger vs. Convery* and *Mott vs. Commissioners,* both *supra,* the provisions of Article Fifth are identified as a grant of the whole judicial power to the courts named or described (according as it may be viewed) in section 1 of Article Fifth, except such as may be within the cognizance of justices of the peace. "Two courts are established and the character of their jurisdiction described by the Constitution, itself; one with a supreme jurisdiction in the trial of causes (the Superior Court) and one with a supreme and final jurisdiction in determining in the last resort the principles of law involved in the trial of causes." *Styles vs. Tyler,* 64 Conn. 450; *Enfield vs. Ellington,* 67 id. 466; *Dexter Yarn Co. vs. American Fabrics Co.,* 102 id. 529, 538; *Washington District Theatre Co. vs. Moore,* 249 Mich. 673, 680, 229 N.W. 618, 68 A.L.R. 105. The authority to define the powers and jurisdiction of courts delegated to

the General Assembly by the Constitution, relates to those tribunals which it is empowered to ordain. It is to the exercise of this function by that body that the phrase "the powers and jurisdiction of which courts shall be defined by law" in section 1 of Article Fifth alone has reference. As observed *supra,* the exercise of this authority involves no grant of judicial power, for the Legislature has none to bestow, but merely the apportioning of jurisdiction. The jurisdiction which the General Assembly is authorized to so allocate is that already vested by the Constitution in a superior court. *Styles vs. Tyler, supra.* If the Legislature were to fail to create any courts inferior to that tribunal the latter would be required to hear and determine all causes above the cognizance of justices of the peace everywhere throughout the State for in it the entire judicial power for the trial of causes reposes. The power of the Legislature to apportion some of this to other courts, ordained by it is not to be confounded with one to divest a superior court of jurisdiction. Since the Legislature bestows no jurisdiction on a superior court, obviously it can take none from it. The deposit of the judicial power in a department separate from that of the legislative is itself a refutation of any constitutional intention that having gone to such lengths to keep it free of legislative control, it at the same time beckoned to the General Assembly to appropriate it under the guise of apportioning it; or to so use that authority that by stripping the constitutional court of all but a vestige of jurisdiction and placing the powers taken from it in tribunals of its own creation, to subvert the whole constitutional design and structure and replace it with one of its own devising. The indispensable requirement, which if observed, accompanies the apportionment of jurisdiction with no offense to the constitutional intendment is that the legislatively ordained courts be inferior to a superior court. Manifestly a tribunal otherwise inferior but exercising a jurisdiction of causes equal to or greater than a superior court would violate the constitutional mandate. Just as the power in the General Assembly to ordain courts is limited to such as are inferior to a superior court, so, also is the authority to define the jurisdiction of those created in the exercise of it to such as is appropriate to the status, character and place in the judicature of such tribunals. These requirements, of course, are referable to the functions that such courts serve and the purposes that they are designed to achieve. The principal reason accounting for

the establishment of inferior courts generally recognized is that of screening small causes from a court of general jurisdiction thereby preventing its dockets from becoming clogged with numerous proceedings of comparatively little importance and at the same time obviating the necessity of increasing the number of judges to hear matters of such a character which could as well and with greater despatch, under such conditions, be disposed of by a local tribunal. 21 C.J.S. §51, p. 56.

All inferior courts in Connecticut up to the session of 1941 were adapted to fulfill this function. "County or inferiour courts" at the time the Constitution was adopted had ". . . . full power to hear, examine, try and determine by a jury or otherwise according to Law, all civil causes, real, personal or mixt and also all criminal matters not extending to life, limb, banishment, adultery or divorce, regularly brought before them; but said county courts shall not have jurisdiction in any criminal matter where the punishment shall extend to confinement in Newgate, except only in the case of horse-stealing." In equity their jurisdiction was limited to causes "wherein the matter or thing in demand does not exceed the sum of three hundred and thirty-five dollars (excepting suits for relief against any judgment given or cause depending at law in the superior court) . . . ." Statutes of Conn., 1808, Title XLII, Chapter 1, §§42, 43, p. 207. This was practically as it had been from the time such tribunals were first established with the exception of their jurisdiction in equity and minor changes in actions of criminal cognizance. While the description of civil matters at law which they were authorized to entertain seems broad, these tribunals, both before and after the adoption of the Constitution collectively constituted "a convenient forum for the trial of lesser causes . . . ." Judicial and Civil History of Connecticut, Loomis & Calhoun, p. 135. The jurisdiction of the city courts which existed when the Constitution was adopted (by statutes originally enacted in 1784) was the same as that of the county courts then was or might thereafter be, except that none was conferred upon them where the title of land was involved (Hartford, Statutes of Conn., 1808, Title XXXIV, Chapter 1, p. 124); (New Haven, id., Title XXXIV, Chapter XI, p. 152); (New London, id., Title XXXIV, Chapter XVII, p. 164); (Middletown, id., Title XXXIV, Chapter VIII, p. 141), and (Norwich, Title XXXIV, Chapter XVIII, p. 175).

After the adoption of the Constitution the powers of the

county courts, and with them those of the city tribunals, were progressively contracted until at the time the county courts were abolished (An Act approved June 19, 1855, Chapter XXVI, §17, Public Acts, 1855-1860, p. 29), the causes of which they had exclusive civil cognizance at law were such as contained demands for not more than $100 and they had none in equity. Revision of 1854, p. 75. Appeals lay from the county courts to the Superior Court in certain cases, except where the matter in demand did not exceed $200. Statutes of Connecticut, Compilation 1854, Chapter V, pp. 74, 75. From the city courts appeals in matters where the same were allowed were required to be taken directly to the Supreme Court of Errors (see Acts and Revisions cited supra re: city courts in Hartford, etc., etc.). No mention need be made of town courts during the period referred to as their jurisdiction was such as comprehended matters involving only comparatively trifling sums.

It is thus clear that all of the inferior courts, following the adoption of the Constitution and up to the time that the existence of the county tribunals was terminated in 1855 conformed to the conventional conception of inferior courts in that (1) none had exclusive jurisdiction—particularly when the county courts were discontinued—of any but actions involving very small amounts in causes at law and no exclusive jurisdiction in equity and in addition the county courts, in so far as appeals lay to the Superior Court from its judgments and decrees were inferior in this second respect. *LaCroix vs. Commissioners*, 49 Conn. 596.

When county courts were again created under the name of "Courts of Common Pleas" first for Hartford and New Haven Counties in 1869 (Public Acts, 1861-1869, "An Act to create and establish Courts of Common Pleas, in Hartford and New Haven Counties", Chapter XCII, p. 313); in Fairfield County ("An Act to create and establish a Court of Common Pleas in Fairfield County", Public Acts, 1870, Chapter XXII, p. 375, Public Acts 1870-1874); in New London County (Public Acts 1870, Chapter LXXXVII, p. 440, Public Acts 1870-1874); and the District Court of Litchfield ("An Act to create and establish a District Court in Litchfield County, Public Acts, 1872, Chapter LXXXIX, p. 83, Public Acts 1870-1874), exclusive civil original jurisdiction was conferred upon them in actions at law where the damages claimed and in equity the matter or thing in demand, in value, did not

exceed $500, and of appeals from justices of the peace except in criminal matters. No criminal jurisdiction was then given any of them and no civil, concurrent with the Superior Court. Appeals lay from them directly to the Supreme Court of Errors.

Whether the omission to provide that appeals from inferior tribunals go to a superior court lest these tribunals be held unconstitutional is not involved here since the question presently under examination calls for no attempt to prescribe the minimum requirements which must be met in order that a court created by the General Assembly may be found to be inferior in the constitutional sense, to a superior court, but only (1) whether the State Court of Common Pleas is a tribunal of such character and if it is then whether the exclusive jurisdiction of causes conferred on it—and especially that concerning appeals from the doings of zoning boards of appeal—is a valid definition of its powers and jurisdiction. However, it has been held that where a Constitution creates a trial court and by implication grants it general jurisdiction of all causes, civil and criminal, above that conferred on justices of the peace and also empowers the Legislature to create other courts inferior to the court of last resort by appeal: "That jurisdiction may be made largely appellate by conferring such part of its original jurisdiction on inferior courts as the General Assembly may provide, but it cannot retrench the extent of its jurisdiction which it must retain either by original or appellate process....From the inferior courts, therefore, appeals must go to the Superior Court of the county and not direct to this Court. Subject to these constitutional restrictions, the General Assembly may allot the jurisdiction below the Supreme Court. It may create criminal courts or circuit courts, city courts or any other courts and give them all or such part as it thinks proper, of the original criminal or original civil jurisdiction above that given by the Constitution to Justices of the Peace....but if it gives such courts concurrent jurisdiction, civil or criminal, of such portion of the original jurisdiction which is left to be exercised by the Superior Court, still in such cases an appeal must lie from such inferior or intermediate courts to the Superior Court as in all other cases in which there is a right of appeal for the General Assembly cannot "without conflict with the other provisions of the Constitution" either deprive the justices of the peace of the jurisdiction conferred on them

by the Constitution or deprive the Superior Courts of their constitutional position as Superior Courts over all other in-ferior courts and with, at least, appellate jurisdiction of all matters from which appeals would lie to this court" *Rhyne vs. Lipscombe,* 122 N.C. 655, 656. It is unnecessary to de-termine here whether provision for appeals from the judgments of legislatively ordained courts to a superior court is an essen-tial feature of and without which they fail to qualify as in-ferior tribunals within the constitutional conception. Obviously, however, where that feature is lacking there is no other way in which such courts can meet the requirement that they must be inferior to a superior court except that the jurisdiction of causes exercisable by them be confined to such as involve little in the way of damages and small values as respects the subject-matter in actions in equity.

The characteristics of small exclusive, original jurisdiction with appeal direct to the Supreme Court of Errors where any is provided, first introduced when the city courts were estab-lished, has since featured practically all of the legislatively ordained tribunals since the old county courts were abolished. Before 1875, a policy was commenced, as evidenced by Acts then adopted, as well as at succeeding sessions of the General Assembly, of increasing the concurrent jurisdiction with that of the Superior Court of tribunals ordained by the legislature. It was initiated by conferring jurisdiction on the Court of Common Pleas in New Haven County concurrent with the Superior Court in causes demanding damages between $500 and $1,000 and where the subject-matter, in equity, was of a value between these amounts. Rev. 1875, Chapter IV of Title 19, §3. And later made applicable to all Courts of Common Pleas with the exception of Litchfield and the District Court of Waterbury (the jurisdiction of which courts are noticed below). Gen. Stat. (1888), §723. The limit of such concurrent jurisdiction in legal and equitable matters reached $2,000 be-fore the revision of 1902, Gen. Stat. (1902) §5557, where it remained until the existence of all the county Courts of Com-mon Pleas was ordained to be terminated at the 1941 session of the General Assembly and the State Court of Common Pleas established. A notable exception to this policy of extending concurrent jurisdiction of the county Courts of Common Pleas occurred in the case of the Court of Common Pleas for the District of Waterbury which was the successor of the District Court of Waterbury. The last named tribunal was established

in 1881 (Public Acts, 1881, Chapter CXXI, Public Acts, 1881-1887, p. 68). This court, which supplanted the City Court of Waterbury, and succeeded to the jurisdiction theretofore exercised by the latter, had no original exclusive jurisdiction whatever, but its cognizance of causes concurrent with the Superior Court embraced "all civil cases wherein the title of land is not concerned" and in equity (in common with a provision which appears in all acts establishing inferior courts) none of suits to enjoin actions pending in the Superior Court. The abolishment of the District Court of Waterbury in 1927 did not interrupt a policy of adding to its powers or that of its successor, (the Court of Common Pleas for the District of Waterbury) (Public Acts, 1927, Chapter 181, §1) which made it unique among the legislatively created tribunals of the State. See: Public Acts, 1887, Chapter XXV, Public Acts, 1881-1887, p. 680; Public Acts, 1889, Chapter CXXII, Public Acts, 1889-1895, p. 68; Public Acts, 1893, Chapter II, Public Acts 1889-1895, p. 200; Public Acts, 1895, Chapter CLXXI, Public Acts, 1889-1895, p. 540; Public Acts, 1895, Chapter CCCXXII; Public Acts, 1889-1895, p. 666; Public Acts, 1895, Chapter CLXI, Public Acts, 1889-1895, p. 526; Public Acts, 1901, Chapter 148, Public Acts, 1897-1901, p. 1320. As a result of all these and other enactments the Court of Common Pleas of the District of Waterbury at the time is was abolished by the Act here under examination at the 1941 session of the General Assembly, had concurrent jurisdiction with the Superior Court "in all civil actions in which equitable relief only shall be demanded and of appeals from assessments of benefits and damages made by the City of Waterbury or by the borough of Naugatuck and.... all other civil actions wherein the matter in demand shall exceed $100, provided the parties or either of them reside within the limits of the judicial district of Waterbury." Gen. Stat. (1930) §5440.

The extension of jurisdiction concurrent with that of the Superior Court which began soon after the abolition of the old county courts in 1855 was not restricted to the county Courts of Common Pleas and the District Court of Waterbury. It became a marked characteristic of city courts. Without putting down here any analysis of this phenomena as it presented itself in each instance, reference may be made, as a fair example of the tendency, to the City Court of Waterbury which as noted, *supra,* was later succeeded by the District Court of Waterbury. That tribunal was established by an act

approved June 29, 1866 (6 Special Laws, p. 68, amended as appears on pp. 251 and 441, respectively) as a result of which its jurisdiction comprehended "cognizance of all civil cases in which the debt, trespass, damage or other matter in demand, shall exceed the sum of $50" — an original jurisdiction almost completely concurrent with that of the Superior Court. The significant consideration here, however, is that in all of the history of legislation concerning inferior courts in Connecticut — and certainly so since long before the abolition of the old county courts — research unearthed but one instance in which original exclusive jurisdiction has been given any tribunal created by the General Assembly exercising general jurisdiction of civil causes, in excess of $500. The lone exception is the District Court of Litchfield, the exclusive original jurisdiction of which when established (Public Acts 1872, Chapter LXXXIX, Public Acts, 1870-1874, p. 83) was $500 in both legal and equitable causes but appears in §724 of the Gen. Stat, Rev. of 1888, to have been increased to $1,000 in both instances. This may have been an error in the revision as no Act has been found upon which to justify the change. At any rate, the departure was speedily corrected for it was provided in an Act passed at the session of 1889, in effect, that the exclusive original jurisdiction should be the same as that of the county Courts of Common Pleas, namely not more than $500 in damages demanded or in the value of the subject-matter in any proceeding in equity. Public Acts 1899, Chapter 38, Public Acts 1897-1901, p. 1004. It so remained when the District Court of Litchfield ended its existence and was succeeded by the county Court of Common Pleas for Litchfield County (Public Acts 1883, Chapter CX, Public Acts 1881-1887, p. 289) and was so defined at the time its extinction took place at the 1941 session of the General Assembly. Gen. Stat. (1930), §5439.

This long continued policy, consistently adhered to practically from the commencement of constitutional government in Connecticut is highly probative in its implications. The intelligence which it conveys is, moreover, confirmed by the fact that the General Assembly at no time since the adoption of the Constitution has definitely essayed to define the jurisdiction of a superior court, until the passage of the Act of 1941 with which concern is had here, with one exception — and that quickly corrected: In 1871, ("An Act in Addition to 'An Act to create and establish a Court of Common Pleas in

New London County'," Public Acts 1871, Chapter III, p. 518)
it was enacted (§2) that all of the criminal jurisdiction there-
tofore exercised by the Superior Court in New London
County should thereafter be exclusively exercised by the Court
of Common Pleas established there with the exception of
crimes for which the punishment might be death or imprison-
ment for life. However, when the General Assembly next
convened, it repealed that Act and provided that the cog-
nizance of all criminal causes in New London County should
be in the Superior Court. Public Acts 1872, Chapter LXXIV,
p. 42. It is true that every revision and many acts passed in
the intervals between them contain expressions to the effect
(e.g. Gen. Stat. [1930], §5441) that all actions demanding
damages and causes in equity, where the relief sought is above
an amount elsewhere defined as the highest limit of the con-
current jurisdiction of another or other courts, "shall be brought
to the superior court;" and that all causes above the cognizance
of justices of the peace shall be within the jurisdiction of the
Superior Court in counties where there are no Courts of Com-
mon Pleas (id. §5438). In none of these, however, is there
any provision affecting to prevent the filing of action in that
tribunal in any cause claiming relief in any sum not lower than
$500 which is an amount concededly within the exclusive
jurisdiction of an inferior court. Such provisions are hence
not definitive, but merely descriptive, of the proper jurisdic-
tion of a superior court as conferred by the Constitution
where, pursuant to the power delegated, the General Assembly
has ordained inferior courts and defined their exclusive original
jurisdiction appropriately to their status as such. As a merely
declaratory legislative expression such provisions are neither
an encroachment upon the judicial power nor competent to
define it. *Hoopes, Appeal vs. Bradshaw,* 231 Pa. St. 485, 490,
80 Atl. 1098, 110 A.L.R. p. 57.

In the opinions of some of the cases expressions occur which
might indicate on superficial examination a tendency to view
the source of the jurisdiction of a superior court as statutory.
Of these the following, among others, may be cited. *Town of
Bridgeport vs. Blinn,* 43 Conn. 274, 279, 280; *Crandall vs.
State,* 10 id. 339, 365; *State vs. Peck,* 31 id. 466; *State vs.
Carroll,* 97 id. 598, 599, 117 Atl. 694; *State vs. Chin Lung,*
106 id. 698, 719, 138 Atl. 804. It is sufficient to note that in
none of them was the question involved here presented and,
of course, was not even referred to. Likewise, it is possible that

a minute examination of the statutes might reveal instances in which the General Assembly has legislated concerning matters within the exclusive purview of the judicial department. Of these and any other such instances the following is apropos: "But no dicta of judges, no doubtful or improper legislation, can alter the plain fact that in 1818 the people, in the exercise of their sovereignty, granted to the General Assembly then constituted the legislative power and forbade their exercise of other than legislative power (unless specially granted) and granted to this court and other courts then constituted the judicial department, the judicial power and forbade their exercise of other than judicial power." *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 592. Considered together with the construction of Article Fifth of the Constitution accorded it here, the policy of the legislature in defining the exclusive original jurisdiction of courts created by it with which this is wholly consistent, while not conclusive is of most persuasive force. *State vs. McCook*, 109 Conn. 621, 649, 147 Atl. 126; *Water Commissioners vs. Curtis*, 87 *id.* 506, 511, 89 Atl. 189, and cases cited in the opinion. While on the other hand even if it could be assumed that the intendment of such constitutional provisions is obscure, the departure from the practice and policy of prior legislatures in defining the exclusive original jurisdiction of the state Court of Common Pleas as five-fold of what it had ever done before is one of such short duration and so isolated as to be without any convincing quality. *State vs. McCook, supra,* p. 642.

To hold that the Legislature has power to define the jurisdiction of a superior court either directly or under the guise of defining that of inferior courts by excluding that tribunal from jurisdiction of causes within the cognizance of a court of such general jurisdiction, would not only conflict with the conclusion underlying the holdings in the cases cited and discussed *supra* but would, also, nullify one of the important incentives for the adoption of the Constitution at all. While there were other influences demonstrative of the necessity for a written statement of organic law, one of the dominant, if not the most compelling, which led to the formulation of the Constitution was the generally recognized effects upon the legislatively made and endured judicature of the coincidence of both legislative and judicial powers in the one body — the pre-constitutional General Assembly. The evils which arose from that condition were largely of two species, but equally,

actually and potentially disastrous in their effects upon the judicial power and the judiciary, itself. On the one hand, was the authority of the legislative body, and the temptation to exercise it, to interfere with judgments even after these had been reviewed by the Supreme Court of Errors of the period by setting them aside or modifying them. There were not a few instances of the exertion of this power but the dangers which arose from it were at no time more strikingly dramatized than in the case of *Peter Lung* referred to in *Styles vs. Tyler, supra,* p. 448, when, as a result of legislative interposition, Chief Justice Swift was moved to make pointed public protest. On the other hand, there was the menace to judicial decisions in the courts, themselves, with a resulting lack of public confidence in the established tribunals and no where less than in the pre-constitutional Supreme Court of Errors. The claim was current for 15 years before the Constitution was adopted that members of the Council who were either actually or potentially members of that tribunal pleaded cases, as lawyers before it. The existence of both the Supreme and Superior Courts was always tenuous and at the will of the legislative body which having created them, could effect their demise in the same way. The aim of the Constitution was not only to end this condition of affairs but to provide barriers to the recurrence of any which might impeach the honesty of judicial determinations or threaten their sanctity and conclusiveness when once made. The integrity of judicial decisions is guaranteed in the Constitution by the complete separation of the judicial from the legislative and executive departments as provided in Article Second and the definite vesting of the judicial power in the courts created as provided in Article Fifth; while the complete independence of the judges of the constitutional courts making such determinations is removed from all danger of political, legislative or other reprisal by the provisions of section 3 of Article Fifth which confer life tenure upon them. (Since reduced to terms of eight years by amendment.) The framers of the Constitution, self-evidently intended that the benefits of the provisions noted should extend to all cases where issues of fact are to be decided, as well as those involving only questions of law whether the jurisdiction of such causes be original, or by appeal with trial *de novo* in a superior court. Obviously, the idea is untenable that the Constitution, while resorting to these elaborate and studiously planned devices at the same time provided for their nullification — which

latter would be the inescapable result if it conferred power on the General Assembly to withdraw, as it might please from time to time the jurisdiction of substantial causes from the power of the courts which it creates — whether under an assumption of authority to define the jurisdiction of a superior court or in the exercise of the power to define that of inferior courts ordained by it. An interpretation which would produce such consequences is hardly to be entertained — much less, afforded serious consideration. Manifestly it must yield to one which effectuates the unquestionably fundamental purposes to achieve which the Constitution was adopted.

One last consideration may with propriety be adverted to. The courts are not the property of those who from time to time, as judges, are called upon to preside over them. The safeguards provided in the Constitution to insure their independence and the sanctity of their decisions from all external interference and influence are not for the benefit or comfort of those who administer their proceedings or are responsible for such determinations. The tribunals created are for the benefit of those who may have occasion to vindicate their rights or privileges or to obtain relief against or as compensation for, their violation. Those who do so are entitled to have access to the tribunals provided for them by the people in and through the Constitution. They are deprived of that right when they are forbidden to enter such tribunals for redress of any substantial wrong and compelled to submit their causes to others created by the legislative body. The very fact that the Constitution has ordained one court of general jurisdiction throughout the whole State which it has surrounded with all of the devices humanly devisible to insure its permanence and to protect its character is in itself an admonition that what it has so solemnly done no other body shall have power either to undo by direct act or to destroy by attrition.

The determination is that even though the General Assembly had power under the provisions of Article Fifth of the Constitution to ordain a court with jurisdiction over the entire State, nevertheless, the jurisdiction of causes defined in the Act creating the State Court of Common Pleas is not the definition of the jurisdiction of an inferior court, but a division involving an appropriation of that constitutionally vested in a superior court; that as such it is in excess of the power of the General Assembly to confer on such a tribunal and such definition of jurisdiction is void and of no effect; and, particu-

larly that is true of the provisions of section 50f of the 1941 Cumulative Supplement to the General Statutes, which affects to withdraw from a superior court cognizance of appeals from zoning boards of appeals. It results that the jurisdiction over such a proceeding remains unaffected by anything contained in that Act.

As respects the subject-matter of the appeal: The site of plaintiffs' enterprise is located in an industrial zone. The only reason assigned for the refusal of the building inspector to issue to them the permit to construct the railway in question which is, also, the basis of the action of the board in sustaining that official, is the claim that the use would be noxious "by reason of the emission of odor, dust, noise, gas or smoke." (Building Zone Regulations, Section IV, paragraph 25.) Of the enumerated objectionable attendants, all may be eliminated from consideration except that of noise since there is nothing in the evidence worthy of consideration to indicate the presence of odor, dust, gas or smoke.

As "noise", especially when considered as distinguished from sound is a relative quality, it is necessary to apply the provision in question in the sense in which it is used in the regulations. While on the one hand it need not necessary connote such a condition as would constitute a nuisance *per se* (*State vs. Hillman,* 110 Conn. 92), on the other hand, it is evident that the noise with which the regulation deals must be something more, either in intensity, in prolongation, in volume or the times at which it occurs which sustains a rational relationship to the legitimate objects of zoning laws and regulations. *State vs. Hillman, supra,* p. 102. The particular kind of "noise" with which the content of the paragraph and section here invoked deals, is such as is "noxious." That means, in its most liberal definition, "hurtful, harmful, injurious. . . ." *Johnson vs. Northport Smelting & Refining Co.* 50 Wash. 567, 97 Pac. 746. And this in the signification in which it appears in a zoning regulation must needs mean a noise or noises tending to frustrate the attainments of the objectives of a zoning ordinance.

It would serve no purpose to review or analyze the evidence here. It demonstrably appears that such sounds — rather than noises — as accompany the taking off and landing from the water of the light sea-planes that are based on the premises in question all occur between 9:00 or 9:30 A.M. and sun-

down, and are little, if any,' distinguishable from those emanating from outboard motors on boats and not nearly as continuously audible to the residents south of the area in question as are the latter. Certainly, they do not disturb the people in the plants in the industrial area where plaintiffs' leased property is located. A careful review of the evidence indicates that there is no rational basis upon which to predicate the conclusion reached by the Board that either on the land which plaintiffs use as a base, or on the water adjoining it, is there any "noxious" noise incident to the operation of the enterprise conducted there by plaintiffs or that there may reasonably be anticipated that any would accompany the use of the proposed railway.

The conclusion must be that the board's action in sustaining the building inspection in his refusal to issue to plaintiffs the building permit applied for was arbitrary and unreasonable.

The plaintiffs'. appeal is sustained and the board ordered to direct the-building inspector to issue to plaintiffs, the building permit sought.